SCHRADER & EHLERS *v.* UNITED STATES (No. 1068).[1]

MANUFACTURES OF RUBBER AND FOUNTAIN PENS.

The legislative history of paragraph 187, tariff act of 1909, shows that the several parts of fountain pens are to be distinguished on assessment from fountain pens themselves; that a fountain pen is an ink-holding writing instrument with a pen and complete for use. The goods here were not fountain pens and were properly assessed under paragraph 464, tariff act of 1909.

United States Court of Customs Appeals, April 22, 1913.

APPEAL from Board of United States General Appraisers, Abstract 30437 (T. D. 32926).

[Affirmed.]

*Curie, Smith & Maxwell* (*Thomas M. Lane* of counsel) for appellants.

*William L. Wemple*, Assistant Attorney General (*William A. Robertson*, special attorney, of counsel; *Charles D. Lawrence*, special attorney, on the brief), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

Certain assembled parts of the fountain pen, known as the feed barrel, feed bar, neck, and cap, were assessed by the collector of customs at the port of New York at 35 per cent ad valorem as manufactures of hard rubber under the provisions of paragraph 464 of the tariff act of 1909, which paragraph reads as follows:

464. Manufactures of gutta-percha, ivory, vegetable ivory, mother-of-pearl and shell, plaster of Paris, papier-mâché, and vulcanized india rubber known as "hard rubber," or of which these substances or any of them is the component material of chief value, not specially provided for in this section, and shells engraved, cut, ornamented, or otherwise manufactured, thirty-five per centum ad valorem.

[1] Reported in T. D. 33373 (24 Treas. Dec., 599).

The importer protested that the goods were fountain pens and therefore dutiable at 30 per cent ad valorem under the provisions of paragraph 187 of said act, which paragraph is as follows:

187. Penholder tips, penholders and parts thereof, five cents per gross and twenty-five per centum ad valorem; gold pens, twenty-five per centum ad valorem; fountain pens, stylographic pens, thirty per centum ad valorem; combination penholders, comprising penholder, pencil, rubber eraser, automatic stamp, or other attachment, forty per centum ad valorem: *Provided,* That pens and penholders shall be assessed for duty separately.

The Board of General Appraisers overruled the protest and the importers appealed.

There is but one question presented for determination by the record and the briefs of counsel and that is, Are the articles imported fountain pens or are they only parts of fountain pens?

If the term "fountain pen" as commonly understood embraces only those ink-holding writing instruments which are furnished with a pen and are complete for their intended use, then the goods are not fountain pens. On the other hand, if by popular usage "fountain pen" has come to mean not only the completed article, but also the article lacking the pen point and therefore incomplete, then the claim of the importers was well founded and their protest should have been sustained.

The original pen was the quill pen and originally the word "pen" meant not a writing appliance which was separable into parts, but one in which nib and stalk were made of a single piece. After the invention of the steel pen, penholder and nib were made up in separate pieces, and by a kind of metonymy the word "pen" came to signify not only the completed article but the pen point as well. While the term in its common acceptation may mean either the pen nib or the nib and the holder assembled and ready for writing, we are not aware that it has ever been applied to the holder alone or to any device serving as an adjunct to the pen point and designed to facilitate the use of the latter. In our opinion the goods are at best incomplete fountain pens, and are therefore not covered by a designation the common; ordinary meaning of which implies an article complete, finished, and ready for use.

In this connection it is worthy of note that paragraph 187 provides for penholders *and parts thereof,* and that it does not provide for parts of fountain pens. That that omission was not the result of a legislative lapse, but of deliberate design, is made evident by the fact that the paragraph as it passed the House contained a provision for parts of fountain pens, which provision was stricken out in the Senate. As modified by the Senate the paragraph was agreed to by the House. To make an incomplete fountain pen or a part of a fountain pen dutiable under paragraph 187 the fact that Congress intentionally

excluded "parts of fountain pens" from its operation would have to be ignored, and that course we are not prepared to take.

It may be that the assembled parts of fountain pens, lacking nothing except the pen point to make the article complete, are known in trade and commerce as fountain pens; but if so it was the duty of the importers to establish that fact by competent evidence. The importers having failed to make any such proof, it is our duty to give to the tariff designation its common, ordinary meaning, and as that meaning excludes the merchandise from the operation of the paragraph upon which the claim of the importers was based, we must hold that the protest was properly overruled. United States v. Wells, Fargo & Co. (1 Ct. Cust. Appls., 158, 162; T. D. 31211).

The decision of the Board of General Appraisers is *affirmed*.