(C. D. 159)

UNIVERSITY OF CHICAGO *v.* UNITED STATES

United States Customs Court, Second Division

(Decided May 10, 1939)

*Tompkins & Tompkins (J. Stuart Tompkins* and *Allerton de C. Tompkins* of counsel) for the plaintiff.

*Joseph R. Jackson,* Assistant Attorney General (*John F. Kavanagh, John J. McDermott, William Whynman, Richard H. Welsh,* and *William J. Vitale,* special attorneys), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: These are suits against the United States, arising at the port of Chicago, brought to recover certain customs duties alleged to have been improperly exacted on parts of a particular carillon shipped from England on four different vessels on four

different dates. Duty was levied thereon at the rate of 20 per centum ad valorem under the provision in paragraph 1541 (c) of the Tariff Act of 1930 for carillons, plus 3 cents per pound on the total weight of all the parts under section 601 (c) (7) of the Revenue Act of 1932 as an article composed in chief value of copper.

It is claimed that said articles are properly dutiable as separate entities at the rate of 20 per centum ad valorem under said paragraph 1541 (c) as parts of carillons, plus the appropriate tax imposed by said section 601 (c) (7) as follows: 3 cents per pound where the individual part is composed in chief value of copper, and three-fourths of 1 cent per pound or 3 per centum ad valorem (whichever is the lower) where the individual part is not in chief value of copper but contains 4 per centum or more of copper by weight.

The record is quite voluminous, covering 168 typewritten pages of oral testimony, together with numerous exhibits including depositions taken abroad under commissions issued out of this court.

Exhibit 1 is the original contract between the University of Chicago, the plaintiff herein, and the English manufacturers of the imported articles.

Exhibit 2 is a copy of said contract which was substituted for the original.

Exhibit 3 is the deposition of Arthur Henry Townsend, shop foreman of the English manufacturers.

Exhibit 3–A consists of questions and answers in Exhibit 3 arranged in sequence.

Exhibit 4 is the deposition of William Campbell, an accountant in the employ of the English manufacturers.

Exhibit 7 is the deposition of Herbert Edward Anderson and of William Campbell.

Exhibit 8 consists of questions and answers in Exhibit 7 arranged in sequence.

Illustrative Exhibit A is a photograph of what is known as a ferrule, a short piece of pipe used as a guide for wire going through the roof.

Illustrative Exhibit A–1 is a photograph of a relay terminal box.

Illustrative Exhibit B is a photograph of the motor generator set.

Illustrative Exhibit C consists of photographs of two 5-horsepower electric motors.

Illustrative Exhibit D consists of photographs of two 3-horsepower electric motors.

Illustrative Exhibit E consists of photographs of four ¾-horsepower electric motors.

In addition to the exhibits the plaintiff offered the testimony of four witnesses. No evidence was introduced by the Government. Two of said witnesses appeared at the first hearing held at Chicago on October 18, 1934. One, Howard G. Halsey, testified that during

the Summer and Fall of 1932, and for about four years, he was assistant superintendent of construction on the campus of the University of Chicago; that he was a graduate of the Missouri School of Mines in mining engineering; that he also had had experience in civil engineering and construction work for twelve years; that he was familiar with each article represented by the invoice items herein; that he had examined each of said articles to determine whether or not it contained copper; that the following contained no copper, or an infinitesimal amount thereof as indicated:

*The so-called wood clavier stool or organist's seat:*
> 500 feet of wire.
> 100 steel ferrules.
> Spares for clavier consisting of wood pedals, felt pads, steel rods, steel rollers,. and steel hammers, and little rubber contact points.
> Contacts and screws consisting of rubber bumpers on the ends of the hammers, and steel screws.
> Mercury Switch bases composed of slate.
> 16 mercury tubes for switches composed mostly of glass and mercury with an infinitesimal amount of copper in 2 small contact points; and that the so-called resonators are composed of brass compounded with aluminum.

On cross-examination he testified that most of the imported articles arrived in this country before he entered the employ of the University of Chicago; that he knew how a carillon was played but never tried to play one himself; and that although some of the 500 feet of wire was painted black he could tell by scraping off some of the paint that the wire contained no copper.

The second witness, L. R. Flook, superintendent of buildings and grounds of said university, testified that he had made a study of carillons and their operation; that he was familiar with the different parts thereof and had assisted in supervising the erection of the imported articles at said university; that he had made preliminary estimates for said erection based on preliminary contract prices and all other costs involved in the proper installation of the complete carillon; that he was a graduate of the University of Michigan in civil engineering, having specialized in mechanical and electrical construction work; that he was present at the installation of the carillon bells at the Riverside Church in New York City; that he had participated in drawing the contract with the English manufacturers of the imported articles, a copy of which contract is in evidence as Exhibit 2; that a practice console is a self-contained instrument similar to a piano in which little resonator parts are struck by little pegs similar to the wire keys of a piano; that the purpose of the practice console is to enable a student to practice on the carillon without causing the bells to emit too loud a sound; that a resonator is a thin tube of metal which when struck magnifies the sound; that similar to the xylophone these tubes are of different lengths for different notes; that the only resonators

installed in Chicago were those installed in connection with the practice console; that the keyboard on which the operator of the carillon plays is called the console; that the clavier stool is the bench about 5½ feet long and 16 to 18 inches wide on which the carillonneur sits as he plays, using his hands and feet; that the upper and lower halves of the clavier were shipped separately for convenience but that the whole was an entirety; that the ferrules are little short pieces of pipe cut into different lengths and are simply used as guides where the wires go through the roof and are separate parts of the carillon; that the articles known as mercury switches and bases are used in connection with the electropneumatic mechanism for operating the carillon bells; and that in the case containing so-called spares for claviers were keys covered with felt, rubber bumper strips, and other minor parts made in England for the carillon.

On cross-examination he testified that the previous witness, Halsey, had immediate charge of the installation of the carillon at the University of Chicago under the direction of the witness.

At the close of this witness' testimony, counsel for the plaintiff moved to consolidate the four protests herein, action on which motion was reserved by the trial judge for determination by this division.

At the second hearing, held at New York on December 9, 1935, counsel for the plaintiff offered in evidence the deposition of Arthur Henry Townsend (Exhibit 3), after questions and answers Nos. 8, 11, 15, 16, 20, 28, 29, and 33, and all references to prices and values in Nos. 23, 24, and 35 had been stricken out.

The case was then continued until the next docket in Chicago where, on July 13, 1936, it was again continued to January 12, 1937, at which time it was continued peremptorily to November 18, 1937, at which time these four protests were consolidated for the purpose of trial by Evans, Judge.

At this last hearing the plaintiff offered in evidence the testimony of W. E. Mower, an electrician in the employ of the University of Chicago. He testified that in conjunction with Mr. Townsend, the erector from England, he supervised the installation of the small metal parts and performed all the electrical work in the installation of the carillon in question; that he had had twenty-three years' experience as an electrician in the employ of the Western Electric Co., the Chicago and North Western Railroad, and the Uniform Printing Co.; that certain articles of American manufacture were installed as parts of the carillon in question, among them being a 3-unit, 5-horsepower generator set for the low voltage operation of the relays in the carillon, a relay terminal box to control the low voltage apparatus, electric motors on each of three swinging bells, to wit, two 5-horsepower motors on the large bell, two 3-horsepower motors on the next sized bell, two ¾-horsepower motors on the next sized bell, and on each of

the two smaller bells one ¾-horsepower motor; that the generator set supplied the low voltage current to operate the tripping relays on the starting gear which strikes the hour and the quarter bell which strikes the quarter hour; that said generator set also operates a low-voltage solenoid on the electropneumatic piston; that the relays in the terminal box were operated by contacts from the keyboard of the console and were also operated from the quarter-barrel when the quarter hour was struck; that the relay terminal box was purchased from the Auth Manufacturing Co. of New York; and that all of the electric motors were purchased from the General Electric Co. of Schenectady.

At this juncture, counsel for the plaintiff offered in evidence a blueprint of the motor generator set, which was excluded by the trial judge but marked Exhibit 5 for identification. The photograph of the relay terminal box was then admitted in evidence as Illustrative Exhibit A–1, and a photograph of the motor generator as Illustrative Exhibit B, in each instance over the objection of counsel for the Government.

The witness then testified that the 5-horsepower electric motors in regard to which he had previously testified were used for the mechanical pealing or swinging of the large bell, the weight of which was eighteen and one-half tons. Photographs of the 5-horsepower, 3-horsepower, and ¾-horsepower electric motors were admitted in evidence as Illustrative Exhibits C, D, and E, respectively, in each instance over the objection of counsel for the Government.

The witness then testified that the function of the relay terminal box is to operate the low voltage solenoids on the electropneumatic pistons from the keyboard of the console; that if it were not for the relay terminal box or some other mechanical device not included in the importations herein the pistons would not function to emit sound.

The fourth and last witness, Jack Gordon, testified that he was a customs broker in the employ of the International Forwarding Co. and as such prepared the entries herein; that he had obtained from his files two duplicate shipping specifications itemizing the contents of each of the packages in said shipments, and that both of them were on the letterhead of the English manufacturer.

Counsel for the plaintiff then offered in evidence the two papers because the originals were attached to the invoice. Counsel for the Government objected on the ground that the witness did not make up the list and that there was no evidence that the weights given tallied with the weights found by the customs officials. The objection was sustained by the trial judge and the documents in question were marked as Collective Exhibit 6 for identification.

At the conclusion of the witness' testimony the case was continued to the next Chicago docket in order that the plaintiff might secure further depositions from abroad. On February 2, 1938, the deposi-

tions not having been returned, the case was continued to June 1, 1938.

At the last hearing held on the latter date at Chicago, the plaintiff offered in evidence the deposition of William Campbell of the firm of Gillett & Johnston of Croyden, England, which was admitted in evidence as Exhibit 4 over objection of counsel for the Government.

Exhibit 2, which is a copy of a contract entered into between the University of Chicago, the plaintiff herein, and Gillett & Johnston, known as the Croyden Bell Foundry, Ltd., the English manufacturer, among other things, provides that—

A. The Contractor agrees to manufacture, deliver, and install in the Chapel Tower, University of Chicago, a complete Carillon and accessories, according to the specifications and on the terms and conditions hereinafter set out; said Carillon to include 64 bells, and with the accessories, to be suitable for installation in said tower.

In the deposition of Arthur Henry Townsend (Exhibit 3), the affiant testified that he was shop foreman of the English manufacturer of said carillon; that he was familiar with each of the following carillon parts described in invoice 20113 covered by protest 704292–G:

| Case No. | Articles | Component materials |
|---|---|---|
| 1 | Clavier stool | Wood, steel wood screws, felt padding, leather, brass nails. |
| 2 and 3 | Clavier top and bottom halves | Wood, iron, steel, brass, aluminum, rubber, and felt. |
| 4 | Resonators, 500 feet wire, 100 ferrules, spare for clavier, contacts, and screws. | White metal alloy, stainless steel wire, galvanized iron wire, phosphor bronze, steel springs, steel wood screws, brass wood screws. |
| 5 | Mercury switch bases and sundries | Glass, mercury, iron, slate, aluminum, mica, and brass screws. |
| 6 | 16 Mercury tubes for switches | Glass and mercury. |

that the weight of the copper therein was:

| Case No. | Pounds |
|---|---|
| 1 | ¼ |
| 2 and 3 | 39 |
| 4 | 3 |
| 5 | ¼ |

that in case 4 the weight of the articles was as follows:

| | Pounds |
|---|---|
| Resonators (white metal) | 132 |
| Steel wire | 241 |
| Steel ferrules | 41 |
| Steel springs | 31 |
| Steel wood screws | ½ |

that in case 5 the weights of the different components were:

| | Pounds |
|---|---|
| Mercury | 9½ |
| Iron | 36 |
| Slate | 8 |
| Aluminum | 181 |

that in case 1 the weight of the wood was 163 pounds and in cases 2 and 3, 412 pounds; that the percentages of the different component materials were:

Case No. 1:

| | Percent |
|---|---|
| Brass nails | 0.625 to 1. |
| Steel wood screws | 0.83. |
| Wood | 29.17. |
| Leather | 60.833. |
| Felt pads | 8.542. |

Cases 2 and 3:

| | |
|---|---|
| Wood | 81.93. |
| Wrought iron | 6.99. |
| Brass | 5.846. |
| Steel | 3.161. |
| Aluminum | 1.76. |
| Felt | 0.276. |
| Rubber | 0.037. |

Case No. 4:

| | Percent |
|---|---|
| Brass wood screws | 100.00 brass. |
| Phosphor bronze | 100.00 phosphor bronze. |
| Resonators | 100.00 white metal alloy. |
| 500 ft. steel wire | 100.00 steel. |
| 100 ferrules | 100.00 steel. |
| Steel springs | 100.00 steel. |
| Steel wood screws | 100.00 steel. |

Case No. 5:

| | |
|---|---|
| Aluminum | 62.214. |
| Iron | 17.18. |
| Slate | 9.54. |
| Brass screws | 1.91 brass. |
| Mica | 0.954. |
| Mercury | 0.753. |
| Glass | 0.572. |

Case No. 6:

| | |
|---|---|
| Mercury | 92.92. |
| Glass | 7.08. |

In the deposition of W. Campbell (Exhibit 4) the witness testified that as accountant for Gillett & Johnston, Ltd., he controlled all the financial transactions of said company, including the purchase and cost of materials; that he was familiar with the materials in each of the items described in said invoice 20113 and with the cost thereof; that the prices paid for said materials entering into the clavier stool in case 1 were as follows:

| | |
|---|---|
| 163 pounds wood | $7. 50 |
| leather | 54. 75 |
| felt pad | 7. 69 |
| steel wood screws | . 80 |
| ¼ lb. brass nails | . 57 |

that the cost of processing the wood amounted to $12, no processing being required on the other four items; that the percentage of cost of these several component materials at the time when they were

ready to be assembled into the completed article as contained in case 1 was as follows:

Percent

Leather _____ 65. 72
wood _____ 23. 41
felt padding _____ 9. 23
steel wood screws _____ . 96
brass nails _____ . 68

that the purchase price of the materials contained in cases 2 and 3 on said invoices was as follows:

412 lb. wood _____ $45. 00
brass _____ 14. 63
iron _____ 11. 25
steel _____ 9. 00
aluminum _____ 6. 00
felt _____ 5. 63
rubber _____ . 80

that the percentages of the cost of materials and processing of the complete articles in cases 2 and 3 are as follows:

Percent

wood _____ 78. 54
brass _____ 7. 74
iron _____ 7. 03
steel _____ 3. 36
aluminum _____ 2. 74
felt _____ . 52
rubber _____ . 07

that the cost of the white metal alloy contained in resonators in case 4 on the invoice was $225, with no cost for processing; that the cost of the 500 feet of stainless steel wire in case 4 was $12.75, with no cost for processing; that the cost of the galvanized iron wire in said case 4 was $0.56, the cost of processing being $6; that the costs of the materials and the processing thereof contained in the articles in case 4 described on the invoice as "100 ferrules, spares for clavier, contacts, and screws," were as follows:

100 ferrules—Cost of material _____ $0. 56
Cost of processing _____ 6. 00

that the spares for clavier is another description for 100 ferrules; that the cost of the contacts and screws was $2.25 and the cost of processing the same $0.75; and that the cost of steel springs was $1.88, with no cost for processing; that the cost of the steel wood screws was $0.75 and of the brass wood screws the same, neither requiring any processing; that the costs of the constituent materials in the articles in case 5 were as follows:

aluminum _____ $6. 00
mercury _____ 3. 00
iron _____ 2. 25
slate _____ 1. 60
brass screws _____ . 75
mica _____ . 37
glass _____ . 23

that the only cost of processing of said last-named articles was as follows:

| | |
|---|---:|
| aluminum | $12. 30 |
| iron | 3. 00 |
| slate | 1. 80 |

that the percentage of cost of materials and labor in the manufacture of the completed articles contained in case 5 was as follows:

| | Percent |
|---|---:|
| aluminum | 58. 47 |
| iron | 16. 77 |
| slate | 10. 86 |
| mercury | 9. 58 |
| brass screws | 2. 40 |
| mica | 1. 18 |
| glass | . 74 |

that the cost of the glass and mercury contained in case 6 on said invoice was:

| | |
|---|---:|
| glass | $1. 20 |
| mercury | 15. 80 |

there being no cost of processing; and that the percentage of cost for labor and materials in the manufacture of the completed articles contained in case 6 was as follows:

| | Percent |
|---|---:|
| mercury | 92. 94 |
| glass | 7. 06 |

In the deposition admitted in evidence as Exhibit 7, the affiant, Herbert Edward Anderson, testified that he was a draftsman in the employ of Gillett & Johnston, Ltd.; that he was familiar with the different materials which entered into the composition of the articles described in invoice 12460, dated June 30, 1932; invoice 13236, dated July 14, 1932; and invoice 16397, dated September 2, 1932; that he acquired such familiarity in the preparation of drawings for the job and subsequently following the different jobs through the factory in the different stages and processes of manufacture. Interrogatory 7 reads as follows:

After receipt of the items named in the preceding Interrogatory No. 5, what, if any, examinations, tests, or checks did you make to see or insure that the materials therein contained were of the kinds that or such as you required or specified for the various carillon parts in question?

This interrogatory the affiant answered as follows:

A. The examination was not my responsibility but our procedure was for the storekeeper to check up the materials against the purchase order, and the foreman to check up against the drawings when the job was in production. There were no scientific tests or analyses made.

He then proceeded to testify that of all the items enumerated in the three invoices herein the item "58 umbrellas" in case 33 on invoice 12460 of June 30, 1932, and two brass tubes described in invoice 13236, dated July 14, 1932, contained copper; that all the remaining

items contained no copper; that the copper content in both of the items last mentioned was more than 4 per centum by weight, to wit, in the umbrellas, 50 per centum, and in the brass tubes, 60 per centum; that based on his experience there are practical and commercial reasons why copper cannot be used in the manufacture of the articles described in the invoices herein other than those mentioned as containing copper.

In the same deposition the affiant, William Campbell, accountant in the employ of the English manufacturer, testified that he was familiar with the costs of the different materials which enter into the manufacture of the items described on invoices 12460, 13236, and 16397 herein and of processing the same; that the source of his information consisted of the orders issued by the stores department against the contract number, all of which passed through his hands, and the labor job cards chargeable to the contract for the carillon herein; that the articles described as brass tubes in case 23 in invoice 13236 contained copper as the component metal of chief value; that he was familiar with the fact that certain parts of the carillon provided for in the contract between Gillett & Johnston, Ltd., and the University of Chicago were purchased by his company from concerns in the United States; that said items consisted of the following:

1 relay box purchased from the Auth Electric Supply Co., 422–430 East 53rd St., New York City, and

4 two-horsepower 220-volt, 60-cycle GEC motors,
2 three-horsepower 220-volt, 60-cycle GEC motors,
2 five-horsepower 220-volt, 60-cycle GEC motors, and
1 three-unit five-bearing motor generating set, all purchased from the International General Electric Co. of New York;

that he obtained his information from the purchase orders placed by Gillett & Johnston with said firms in the United States; that said American firms were instructed by his company to ship the articles specified direct to the University of Chicago; that in answer to the fifteenth interrogatory the witness attached to his depositions certain certified copies of the purchase orders to said American firms. In response to interrogatories 16, 17, and 18, the witness then testified as to the cost of the various articles purchased in the United States, which evidence, in our opinion, is not material to the issue herein.

Upon this record we find the following facts:

1. That the merchandise, the subject of these suits, arrived in the United States in four different vessels on four different dates as follows:

| Protest | Entry | Vessel | Entered | Liquidated |
|---------|-------|--------|---------|------------|
| 704292–G | 2969 | American Merchant | 11/9/32 | 12/22/33 |
| 704290–G | 622 | American Banker | 8/1/32 | 12/29/33 |
| 704291–G | 1614 | American Farmer | 9/27/32 | 12/21/33 |
| 704293–G | 873 | American Trader | 8/12/32 | 12/22/33 |

2. That all of the said articles were imported as carillon parts and as such were subsequently assembled and installed in place at the University of Chicago, Ill.

3. That in said installation there was added to the imported parts certain electrical equipment of American manufacture, which equipment constituted integral and component parts of the complete carillon without which the latter could not perform the functions for which it was designed.

4. That the merchandise referred to in the annexed schedule which is marked "A" and made a part of this decision contains no copper or less than 4 per centum of copper by weight.

5. That the merchandise referred to in the annexed schedule which is marked "B" and made a part of this decision contains more than 4 per centum of copper but is not in chief value of copper.

Counsel for the Government in his brief filed herein contends:

1. That a complete carillon was imported and that the collector was correct in so classifying the imported merchandise under the *eo nomine* provision therefor in said paragraph 1541 (c), and also in subjecting the same to the additional tax of 3 cents per pound under said section 601 (c) (7) of the Revenue Act of 1932 as one complete article composed in chief value of copper, computing the amount due based upon the entire weight of the imported articles, including the bells valued for entry purposes at $104,352 on which no claim is made by the plaintiff herein.

2. That assuming that only parts of a complete carillon were imported the record contains no competent evidence that such parts are neither in chief value of copper nor contain more than 4 per centum of copper by weight.

In support of the first contention counsel quotes at length from our decision in *Japan Import Co.* v. *United States*, T. D. 49224, 72 Treas. Dec. 490. After a careful examination of said decision we are satisfied that it is not here applicable, for the reason, as stated in our findings of fact, that the articles of American manufacture in the instant case constitute integral parts of the complete carillon installed at the University of Chicago, without which said carillon could not function for the purpose for which it was designed.

But, independent of that consideration, the fact that the imported parts were imported at different times in four different vessels would seem to preclude their classification under said paragraph 1541 (c) as a complete carillon. On this point the case of *Benrus Watch Co. et al.* v. *United States*, T. D. 46055, 62 Treas. Dec. 694, would appear to be controlling. There the question at issue involved the tariff classification of certain watch movements. Duty was levied thereon

at the rate of $2 each under paragraph 367 of the Tariff Act of 1922 as watch movements having 15 jewels. We found as facts—

(1) That at the time of purchase the movements in question were all fully set up, assembled, and tested as complete watch movements, but that prior to shipment the main spring and balance wheel were removed from each movement, in which condition the movements were imported;

(2) That when purchased, certain of the movements were minus the ratchet wheel and the ratchet screw and were imported in that condition;

(3) That the said missing parts were imported as separate entities in a different steamer than that containing the incomplete movements;

(4) That each of said missing parts was an indispensable part of the watch movements without which the latter were utterly incapable of performing any of the functions for which they were constructed and designed.

Upon these facts we held that the precise condition of the merchandise as imported must determine the tariff classification thereof, and, since there was no specific provision for parts of watch movements, these assembled parts of watch movements are not included in said provision for watch movements in paragraph 367.

In affirming our decision in the case of *Benrus Watch Co. and Pomerance Co. (Inc.)* v. *United States*, 21 C. C. P. A. 139, T. D. 46467, the appellate court said:

The importers argue, and the trial court held, that the imported goods could not be considered dutiable as watch movements because they were not complete; that said paragraph 367 does not provide for parts of watch movements, and that, hence, such parts must be held to be excluded therefrom. This is the rule, as announced by this court, *Murphy & Co.* v. *United States*, 13 Ct. Cust. Appls. 256, T. D. 41201, and cases therein cited.

They could not, either, be considered as entireties for dutiable purposes, under the authorities. As to those parts which were separately purchased and imported, there can be little question. As to those completely assembled movements from which parts were abstracted, the record establishes that the movements and parts were imported at different times on different vessels. The dutiable status of these goods, as entireties, is controlled by the leading case, *United States* v. *Schoverling*, 146 U. S. 76. There, gunstocks were imported, which were classified for duty as guns. It was shown they were to be fitted with barrels, separately imported. The Supreme Court held they were not dutiable as guns. In the course of the opinion by Blatchford, Judge, this was said:

\* \* \* It nowhere appears that these gunstocks had formed part of completed guns in Europe, nor was the question of the importation of the barrels for the guns involved. In the present case, the dutiable classification of the gunstocks imported must be ascertained by an examination of them in the condition in which they are imported. *Worthington* v. *Robbins*, 139 U. S. 337.

The doctrine of entireties is a familiar one in customs laws. However, we are unaware of any case where parts of articles, even though originally assembled, which were imported at different times and on different vessels, were ever held to

be entireties for tariff purposes. Examples of the cases where the doctrine has been applied are *Altman & Co. v. United States*, 13 Ct. Cust. Appls. 315, T. D. 41232; *Salemi & Sons v. United States*, 19 C. C. P. A. (Customs) 43, T. D. 44892; *United States v. Irwin et al.*, 78 Fed. 799.

That decision would seem summarily to dispose of the first contention of counsel for the Government. In our opinion the collector erred in treating these four shipments of carillon parts as constituting an entirety. Necessarily, then, the copper tax imposed by section 601 (c) (7) of the Revenue Act of 1932 should have been levied as follows: 3 cents per pound on each individual part which is composed in chief value of copper; and three-fourths of 1 cent per pound or 3 per centum ad valorem (whichever is the lower) on each individual part which contains 4 per centum or more of copper by weight but which is not in chief value of copper, and we so hold.

In regard to the second contention of counsel for the Government, we are satisfied that the shop foreman of the English manufacturers and their draftsman and accountant who designed and followed the manufacture of the different parts to completion were sufficiently qualified to testify whether or not such parts contained copper.

Upon the entire record we hold as matters of law—

(1) That all of the articles involved herein are separate and distinct dutiable entities and as such are properly dutiable at the rate of 20 per centum ad valorem under paragraph 1541 (c) of the Tariff Act of 1930 as parts of carillons, as alleged by the plaintiff, rather than at the same rate under said paragraph as constituting a complete carillon, as classified by the collector.

(2) That the articles referred to in the annexed schedule which is marked "A" and made a part hereof contain no copper or less than 4 per centum of copper by weight, and are therefore not subject to nor taxable under section 601 (c) (7) of the Revenue Act of 1932, as alleged by the plaintiff.

(3) That the articles referred to in the annexed schedule which is marked "B" and made a part hereof contain 4 per centum or more of copper by weight but are not in chief value of copper. Such articles are therefore subject to a tax of 3 per centum ad valorem or three-fourths of 1 cent per pound (whichever is the lower rate) under said section 601 (c) (7) of the Revenue Act of 1932 as copper articles of the kind therein made taxable at such rate, as alleged by the plaintiff.

Those claims of the plaintiff are therefore sustained, but as to all other merchandise than that referred to in said schedules "A" and "B" the claims are overruled. Judgment will be rendered accordingly.