## MONTGOMERY WARD & CO., INC.
### v.
### UNITED STATES.
Court No. 71-09-01144,
C.D. 4430; Protest No. 39010000279.

United States Customs Court.
June 4, 1973.

Arvey, Hodes & Mantynband, Chicago, Ill. (Ralph A. Mantynband, Chicago, Ill., of counsel), for plaintiff.

Harlington Wood, Jr., Asst. Atty. Gen. (John V. Henry and Glenn E. Harris, New York City, Trial Attys.), for defendant.

LANDIS, Judge:

The question presented for decision in this action is whether four articles imported together from Italy in November 1970 were properly classified by the Government for customs duty purposes as an electronic musical instrument, dutiable at 17 per centum ad valorem under TSUS item 725.47,[1] or should be classified, as claimed by plaintiff, as merely parts of an electronic musical instrument, dutiable at 11.5 per centum ad valorem under TSUS item 726.80.

The record identifies the articles as a bass foot pedal assembly (exhibit 1); a keyboard chassis assembly (exhibit 2); an amplifier and expansion pedal assembly (exhibit 3), and a reverberation unit (exhibit 4).[2]

---

1. The official papers in evidence (R. 52), establish that duty at 17 per centum ad valorem was assessed upon the full value of the imported articles, less the cost or value of products of the United States used in the assembly of the imported articles pursuant to TSUS item 807.00. The classification of the imported articles under TSUS item 807.00 is not in dispute.

2. Exhibits 1, 2, 3, and 4 (representative of the imported articles) were introduced into evidence at the trial as physical samples. At the close of trial counsel agreed, with the approval of the court, to the withdrawal of the physical exhibits and to the substitution of photographs of the physical samples. Exhibit 6 for identification, a physical exhibit of an electronic organ, was similarly so treated for the record.

TSUS, schedule 7, part 3, wherein musical instruments, parts, and accessories are classified provides in pertinent part as follows:

*Schedule 7.—Specified Products;
Miscellaneous and
Nonenumerated Products*

*Part 3.—Musical Instruments, Parts,
and Accessories*

Subpart A.—Musical Instruments

*Subpart A headnotes:*

\*      \*      \*      \*      \*      \*      \*

2.  For the purposes of this subpart—

(a)  the term *"brass wind instruments"* refers to wind instruments of the "cupped-mouthpiece family" such as, but not limited to, trumpets, trombones, tubas, bass horns, sousaphones, bugles, French horns, cornets, flugelhorns, and saxhorns;

(b)  the term *"wood-wind instruments"* refers to wind instruments, usually sounded with reeds, and includes, but is not limited to, clarinets, oboes, bassoons, English horns, flutes, recorders, fifes, flageolets, piccolos, saxaphones, and sarrusophones; and

(c)  the term *"electronic musical instruments"* embraces all musical instruments in which the sound is generated electrically, and conventional-type instruments not suitable for playing without electrical amplification, but the term does not include conventional-type instruments, fitted with electrical pick-up and amplifying devices, when the instrument is suitable for playing without such amplification.

\*      \*      \*      \*      \*      \*      \*

Electronic musical instruments:

| | | |
|---|---|---|
| 725.46 | Fretted stringed instruments ....... | \* \* \* |
| 725.47 | Other .......................... | 17% ad val. |

\*      \*      \*      \*      \*      \*      \*

Subpart B.—Musical Instrument Parts
and Accessories

*Subpart B headnote:*

1.  This subpart does not cover electrical pick-up or amplifying devices or other articles which are provided for in part 5 of schedule 6 or part 2 of schedule 7.

\*      \*      \*      \*      \*      \*      \*

| | | |
|---|---|---|
| 726.80 | Musical instrument parts not specially provided for ................... | 11.5% ad val. |

If the imported articles in this case had been imported separately, University of Chicago v. United States, 2 Cust. Ct. 358, C.D. 159 (1939), or in a shipment in which one or more of the imported articles were not included, cf. United States v. Baldt Anchor, Chain & Forge Division of the Boston Metals Co., et al., 59 CCPA 122, C.A.D. 1051, 459 F.2d 1403 (1972), the imported articles would very likely be classifiable as parts of an electronic musical instrument.[3] The overall issue for decision is whether, in the unassembled condition imported, the imported articles were sufficiently complete to constitute, in their entirety, an article of the class described in TSUS as electronic musical instruments.[4]

At the trial of this case four witnesses testified for plaintiff and two witnesses testified for defendant. The briefs filed by both sides[5] purport to argue the facts established of record in this case. It is apparent, however, that the argument is not so much with the facts testified to of record, as it is with the weight to be given those facts as they pertain to the imported articles and the electronic musical instrument that the imported articles were classified as.

The tone of this litigation is set in the following undisputed facts. The imported articles, in the vernacular of the industry involved, are finished sub-assemblies, assembled in Italy, from components which were at least, in part, products of the United States.[6] In the condition imported, each of the imported articles is electronically wired ready for assembly into an electronic musical instrument, namely, an electronic organ. Plaintiff sold the imported articles to a producer of electronic organs identified for the purposes of this record as Wellcor. (R. 12.) Wellcor assembled the imported articles, together with a loudspeaker of American manufacture (exhibit 5), into an American manufactured cabinet, using miscellaneous American produced hardware (exhibits 7–A through 7–I) which served the purpose of holding the imported articles and the loudspeaker in the cabinet as a unit. The article so produced is the electronic organ represented by exhibit 6 for identification, model No. 8931, in the condition that that model is sold at retail. The loudspeaker, cabinet, miscellaneous hardware, and various other cost items, including a profit, represent more than 50 percent of what it costs to produce the electronic organ model No. 8931 for sale at retail. (Exhibits 8 and 9.)[7]

---

3. TSUS, General Headnotes and Rules of Interpretation 10 provides as follows:

   (ij) a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

4. TSUS, General Headnotes and Rules of Interpretation 10 provides as follows:

   (h) unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished.

   "It is * * * customs practice, under the doctrine of entireties, to treat the unassembled components of an article under the tariff provision for such article." (United States Tariff Commission, Tariff Classification Study, Submitting Report, page 19.)

   Statutory rule 10(h), with respect to the classification of articles "whether as-

sembled or not assembled" is a codification of the doctrine of entireties as an "aid to ascertain proper classification" of imported articles. Miniature Fashions, Inc. v. United States, 54 CCPA 11, 16, C.A.D. 894 (1966).

5. Plaintiff also filed a reply brief.

6. See, TSUS item 807.00, n. 1.

7. Plaintiff's reference to these costs at two places in its main brief (pages 22, 23) fails to cite any cases which support that the cost of producing an article is material to the classification of the article (independent research similarly failed). These cost factors are of no weight with respect to the classification of the imported articles as an electronic organ. Cf. United States v. Bernard, Judae & Co. et al., 13 Ct.Cust.Appls. 306, 310, T.D. 41230 (1925), cited in United States v. Foochow Importing Co., 18 CCPA 313, 318, T.D. 44562 (1931).

Plaintiff sells the electronic organ model No. 8931 at retail through its national retail outlets. Admittedly, when assembled, the imported articles are unable to generate an audible musical sound without a loudspeaker.

Plaintiff makes two basic points. First, that the imported articles by definition (TSUS schedule 7, part 3, subpart A, headnote 2(c), *supra*) are not an electronic musical instrument (i. e., electronic organ) because when assembled in the condition imported, the article assembled will "not make a [audible] sound". (Plaintiff's brief, page 18.) Second, that the testimony of plaintiff's witness establishes that the loudspeaker (exhibit 5), cabinet and hardware (exhibits 7–A–7–I) are essential and necessary parts of an electronic organ in order for it to function as an entity. Both points merit separate consideration.

■ Before considering those points it is well to note that no one questions that electronic organs are generically electronic musical instruments.[8] Since the generic class of electronic musical instruments must be read to include those instruments commonly understood to be of that class, Hummel Chemical Co. v. United States, 29 CCPA 178, C.A.D. 189 (1941), the precise question here is what, in common understanding, are the essential parts or components that characterize an electronic organ. If an electric organ is commonly understood to be an electronic instrument which literally "makes a [audible] sound", and requires the presence of a loudspeaker, cabinet and hardware, then plaintiff should prevail.[9] Because plaintiff relies on the testimony of its witnesses to establish the essential parts or components that characterize an electronic organ, it is appropriate, first, to review and weigh that testimony.[10]

■ At the outset, it can be said that there is no gainsaying that the thrust of the evidence from plaintiff's witnesses is that a loudspeaker is necessary for an electric organ to make an audible sound; that a cabinet contributes to the tonal quality of an electronic organ and is constructed to hold the imported articles in a position that the player is familiar with and feels comfortable with when playing the instrument; that the hardware is necessary to attach the imported articles and the loudspeaker in the cabinet; that an assembled electronic organ must be tuned, and that they knew of no retail market for an electronic organ in the condition of the imported articles. The difficulty in assessing the weight of that testimony is that it appears to be directed to an electronic organ of the class assembled by Wellcor, model No. 8931, sold at retail, United States v. Sears, Roebuck & Co., 7 Ct.Cust.Appls. 60, 61, T.D. 36388 (1916). Testimony in such a limited area is "too parochial", cf. United States v. Acec Electric Corp., 60 CCPA —, —, C.A.D. 1091, 474 F. 2d 1009 (1973), to have much probative value. The customs classification did not relate to an electronic organ of any particular class, kind, or model, but merely amounted to a determination that the imported articles constituted an electronic musical instrument of the class commonly understood to be an electronic organ. While the intent of the importer and the use to which imported articles are actually put may be properly considered in deciding questions of classification, they are not alone determinative of the proper classification of imported articles. United States v. General Shipping & Trading Co., et al., 44 CCPA 168, C.A.D. 656 (1957); B. A. McKenzie & Co., Inc., et al. v. United States, 47 CCPA 42, C.A.D. 726 (1959).

Furthermore, the testimony of plaintiff's several witnesses significantly es-

---

8. Cf. United States v. Compania Azucarera Del Camuy, Inc., 45 CCPA 4, C.A.D. 664 (1957).

9. Cf. Schrader & Ehlers v. United States, 4 Ct.Cust.Appls. 100, T.D. 33373 (1913).

10. Cf. United States v. C. J. Tower & Sons, 44 CCPA 1, C.A.D. 626 (1956).

tablishes that there are electronic organs sold without loudspeakers (R. 75–76); that the cabinet functions equally to house the instrumentation of an electronic organ in an attractive style for sale at retail and contributes to the tonal quality of an electronic organ (R. 78–82, 90–92, 133–136); that the hardware has nothing to do with the electrical function of an electronic organ (R. 149–151); and that the imported articles are, in essence, "the active components necessary to make an electronic organ" (R. 128–129).

Leaving aside, for discussion *infra*, the argument as to whether a loudspeaker is essential to the normal operation of electronic musical instruments (i.e. to make an "audible sound"), I am brought to conclude and hold that a cabinet and hardware are not essential components of an electronic organ. The hardware clearly is not, see, United States v. Outerbridge & Co., 7 Ct.Cust.Appls. 223, 227, T.D. 36511 (1916).[11] As far as the cabinet is concerned the important fact is that not all electronic organs are housed in a cabinet and, in those that are, the cabinet does not have anything to do with the electronic functioning of the organ. It is significant to me that the lexicons, see, United States v. Sears, Roebuck & Co., 7 Ct.Cust.Appls. 60, 63, T.D. 36388 (1916); United States v. Foochow Importing Co., 18 CCPA 313, 319, T.D. 44562 (1931); United States v. L. Oppleman, Inc., 28 CCPA 298, 302, C.A.D. 158 (1941), not only make no mention of a cabinet as an essential component of organs in general, Excel-

sior Accordions, Inc. v. United States, 48 Cust.Ct. 148, 153, C.D. 2328 (1962), appeal dismissed, but they make clear that in electronic musical instruments it is the sound generating electronic functioning parts which clearly identify and characterize the instrument as electronic.[12] Nowhere have I found that the tonal quality of an instrument is material to its classification as a musical instrument. Cf. United States v. Foochow Importing Co., *supra*. Since the cabinet and hardware do not advance the imported articles to the condition of an electronic organ any more than in the condition imported, without such items, Gallagher & Ascher Company v. United States, 44 Cust.Ct. 355, 357, Abstract 63848 (1960), their use to contain the imported articles does not overcome the presumption that the imported articles, when assembled, constitute an electronic musical instrument commonly known as an electronic organ. United States v. Foochow Importing Co., *supra*, 18 CCPA page 320.

This brings me to discuss the loudspeaker[13] and plaintiff's related point that an electronic organ without a loudspeaker, cannot make an audible sound and is, therefore, not an electronic musical instrument as defined in TSUS. What plaintiff refers to as a definition is headnote 2, schedule 7, part 3, subpart A, *supra*, restated here for convenience as follows:

(c) the term "electronic musical instruments" embraces all musical instruments in which the sound is generated electrically, and conventional-

---

11. Whatever skill and labor were involved in the assembly of the imported articles are unimportant to their classification. United States v. Kronfeld, Saunders, Inc., 20 CCPA 57, 60, T.D. 45679 (1932).

12. McGraw-Hill Encyclopedia of Science and Technology, Vol. 8, page 667 (1960); Encyclopaedia Britannica, Vol. 8, page 244 (1970); see also, Explanatory Notes to the Brussels Nomenclature, Vol. III (1955). Compare, heading 92.07 (electronic principle used "in particular for the 'organ' type of instrument") with heading 92.03 (three main parts of pipe

and reed organs do not include cabinet in which the organ is contained).

13. A loudspeaker is "a device for converting electrical into acoustical signal energy that is radiated into a room or open air." Encyclopaedia Britannica, Vol. 14, page 330 (1970). A common characteristic of electronic music, "arising from the design of electronic instruments, is the requirement that it be heard through loudspeakers or, on occasion, earphones." Encyclopaedia Britannica, Vol. 8, page 244 (1970).

type instruments not suitable for playing without electrical amplification, but the term does not include conventional-type instrumentr, fitted with electrical pick-up and amplifying devices, when the instrument is suitable for playing without such amplification.

The above headnote is not ambiguous. It suffices, in my opinion, to bring into the generic class of electronic musical instruments all musical instruments "in which the sound is generated electrically * * * ."

Plaintiff's point that, without a loudspeaker, an instrument cannot be an electronic organ, is well taken only if a loudspeaker is an essential part of an electronic organ. Cf. Twin Pin Co. of U. S. A., Inc. v. United States, 24 Cust. Ct. 430, Abstract 54254 (1950). The point however, raises the usual difficulty, when applying the doctrine of entireties, of selecting "appropriate standards for * * * [the] analysis" of whether articles imported in a "knock-down" or unassembled condition should be classified under the tariff provision for the article it will be when assembled as an entirety. United States v. Altray Company, 54 CCPA 107, 110, C.A.D. 919 (1967). As the court of appeals stated, the criteria or standard which is applied e.g., "function," "use," "individual entities," "newly created entity," "intent," "design," or "commercial unit," may not circumvent the intent of Congress. Miniature Fashions, Inc. v. United States, 54 CCPA 11, 16, C.A.D. 894 (1966). What remains to be examined is whether using the loudspeaker as one of the necessary criteria would circumvent the congressional intent that the term "electronic musical instruments"

embrace "all musical instruments in which the sound is generated electrically, * * * ." The considerations next discussed, in sum, lead me to conclude that it would.

The attribute common to all electronic musical instruments is that the sound is generated electrically.[14] As the record attests, there are different kinds or models of electronic organs, some with built-in speakers and some without loudspeakers. The loudspeaker does not, on this record, contribute to the manner in which the sound is generated in an electronic organ but only to the manner in which the sound is made audible. The distinction made in the lexicon treatment of electronic musical instruments, between that which is necessary to generate the sound and that which is necessary to make the sound audible, is too manifest to be lightly set aside as a distinction without a difference.[15] It is pertinent that loudspeakers, as articles of commerce, are specifically provided for in TSUS item 684.70. That separate classification treatment finds support in the record testimony that loudspeakers have general use with a variety of musical instruments. The general use of loudspeakers and the separate classification of loudspeakers, materially support my considered opinion that the presence or absence of a loudspeaker was not intended to determine the classification of electronic musical instruments.

A reading of the subpart A headnotes in schedule 7, part 3, wherein Congress attempts to bring "together all musical instruments and parts thereof and most accessories in an arrangement which conforms more closely with the usual grouping of these instruments in the trade",[16] than did the existing para-

---

14. The purest definition of an electronic musical instrument that I have found is that it is a "musical instrument in which an audio signal is produced by a pick-up or audio oscillator and amplified electronically to feed a loudspeaker, as in an electric guitar, electronic carillon, electronic organ or electronic piano." Electronics and Nucleonics Dictionary, page 149, Cooke and Markus (McGraw-Hill, 1960).

15. N. 12, 14. For discussion of inaudible and audible sound see, The A. W. Fenton Co., Inc. v. United States, 67 Cust.Ct. 519, 526, R.D. 11755 (1971), affirmed 70 Cust.Ct. ——, A.R.D. 313 (1973).

16. Tariff Classification Study, Schedule 7, page 227.

graph 1541 of the 1930 Tariff Act, indicates that the classification of the musical instruments therein is one based, not on the completeness of the instruments to make an audible sound, but on factors which essentially characterize an instrument as a "brass-wind," "wood-wind," or an "electronic musical instrument." So far as sound is concerned, a loudspeaker is to an electronic musical instrument what the cupped mouthpiece (referred to in headnote 2(a) of subpart A) is to a brass-wind instrument. A brass-wind instrument will not function to make an audible musical sound, at least in the manner intended, without a cupped mouthpiece. The cupped mouthpiece, in that sense, is as essential to the completion of a brass-wind instrument as is the loudspeaker, in plaintiff's argument, to an electronic organ. The parties do not cite any pertinent legislative history on electronic musical instruments [17] and I have found none. The bit of legislative history there is on brass-wind instruments, however, indicates that the presence or absence of a cupped mouthpiece does not any longer determine the classification of a brass-wind musical instrument, viz:

* * * The existing provision for these instruments reads "brass-winds with cup mouthpieces". The Bureau of Customs interprets this language as requiring that a mouthpiece be imported with each instrument, otherwise the instrument is dutiable at a higher rate as part of a brass-wind instrument. This requirement has no effect on the volume of imports but is a nuisance for importers. Moreover, it is known that the trade-agreement negotiators actually intended the concession to include all brass-wind instruments. In the proposed schedule, a brass-wind is dutiable under the provision therefor whether or not it is imported with a mouthpiece. [Tariff Classification Study, Schedule 7, page 228.]

The headnote on "electronic musical instruments" and "brass-wind instruments" unequivocally does not make the completeness of an instrument so as to enable it to make an audible sound, a condition for classification of those musical instruments. The legislative treatment of the cupped mouthpiece part of a brass-wind instrument adds verity to the view that logically the presence or absence of a loudspeaker was not intended to determine the classification of electronic musical instruments.[18]

Customs is presumed to have found each and every fact necessary to support the classification of the imported articles, when assembled, as constituting an instrument commonly known as an electronic organ. Novelty Import Co., Inc. v. United States, 53 CCPA 28, C.A.D. 872 (1966).

■ Defendant, through its witnesses, effectively dramatized how when assembled as an entirety, the imported articles generate sound electrically, and further demonstrated how, by attaching a loudspeaker, the sound is made audible. For the reasons herein discussed, plaintiff has not overcome the presumption of correctness attaching to the customs classification of the imported articles as an electronic organ, unassembled, dutiable under TSUS item 725.47.

The action claiming classification under TSUS item 726.80 is dismissed. Judgment will be entered accordingly.

---

17. "No oral presentations or written statements were submitted to the Tariff Commission with respect to part 3 of schedule 7 [musical instruments]." [Tariff Classification Study, Schedule 7, page 227 (footnote 1).]

18. See also, Explanatory Notes to the Brussels Nomenclature, Volume III (1955), compare heading 92.07 with heading 92.10 and comments therein.