(C.R.D. 76–5)

SYMPHONIC ELECTRONICS CORP. *v.* UNITED STATES

Court No. 74–4–00896

Port of Boston

(Decided July 7, 1976)

*Barnes, Richardson & Colburn* (*Richard C. King* of counsel) for the plaintiff.
*Rex E. Lee,* Assistant Attorney General (*John N. Politis,* trial attorney), for the defendant.

### MEMORANDUM OPINION AND ORDER

NEWMAN, Judge: The parties in this civil action have filed cross-motions for summary judgment pursuant to rule 8.2. For the reasons stated herein, the cross-motions are denied.

The issue involves the proper tariff classification of plaintiff's Model R860 AM/FM/MPX stereo "chassis", which was imported from Japan in 1972. The district director at the port of Boston assessed duty on the merchandise at the rate of 10.4 per centum ad valorem under the provision in item 685.23, TSUS, as modified by T.D. 68–9, for "Solid-state (tubeless) radio receivers". Plaintiff claims that the imports are properly dutiable at the rate of 6 per centum ad valorem under the provision in item 685.25, TSUS, as modified by T.D. 68–9, for "Other" radiobroadcasting and reception apparatus, and parts thereof.

The imported "chassis" is concededly a "solid-state (tubeless)" device, and the sole question for determination is whether the imports are "radio receivers".

There is no dispute that the Model R860 chassis is the same in all material respects as the "R835 AM/FM tuners", the subject of

*Symphonic Electronics Corp.* v. *United States*, 72 Cust. Ct. 211, C.D. 4543 (1974), wherein I sustained the Government's assessment of duty on the articles pursuant to item 685.23.

The Model R835 in the prior *Symphonic* case comprised a tuner-amplifier,[1] which possessed the basic components and circuitry necessary for the reception of AM, FM and FM stereo multiplex (MPX) signals, and also possessed sufficient amplifying capability to operate loudspeakers. In its condition as imported, the Model R835 had no cabinet, loudspeaker, control knobs or calibrated station dial, and was designed and intended for incorporation into combination radio-phonographs.

In support of its motion for summary judgment, plaintiff has submitted an affidavit of Kenneth L. Freeland, who testified on plaintiff's behalf in the prior *Symphonic* case. Defendant, in support of its cross-motion, has incorporated the record of the prior case, which includes the testimony of three witnesses called on its behalf.

In the prior *Symphonic* case, for purposes of comparison, I cited: "*Cf. Montgomery Ward & Co., Inc.* v. *United States*, 70 Cust. Ct. 193, C.D. 4430, 362 F. Supp. 560 (1973) (*appeal pending*)". There, the importation comprised four components or subassemblies of an electronic organ, which after importation were assembled together with a cabinet, hardware and loudspeaker into plaintiff's "electronic organ", Model 8931. The issue was whether the imported components, standing alone, constituted an electronic musical instrument (an organ) within the purview of item 725.47, TSUS, or parts of a musical instrument under item 726.80. The Customs Court held that the cabinet, hardware and loudspeaker were not essential components of an electronic organ, and sustained the Government's classification under item 725.47.

Subsequent to the prior *Symphonic* decision, the appellate court reversed the judgment in *Montgomery Ward* (61 CCPA 101, C.A.D. 1131, 499 F. 2d 1283 (1974)), finding that the cabinet and loudspeaker were basic parts of an electronic organ, and that therefore the imported components when assembled did not constitute an "electronic organ" within the common meaning of that term. Accordingly, the appellate court held that the Government's classification of the components as an electronic musical instrument under item 725.47 was erroneous.

In arriving at its decision in *Montgomery Ward*, the appellate court observed, *inter alia*, that a cabinet and speaker are basic elements of an organ; that the imported components when assembled were unable to generate an audible musical sound without a loudspeaker; that it

---

[1] Accompanying the R835 tuners were an equal number of power transformers used with the tuners.

was essential to classification as a "musical instrument" there be a capability in an organ of producing sound when played upon; that there was no significant evidence in the record that organs of the type in which the importations were used were ever sold without cabinets; and that a cabinet was essential to the conventional use of an electronic organ.

In essence, plaintiff's position is that my prior decision in *Symphonic* requires a reexamination in light of the subsequent holding of the appellate court in *Montgomery Ward* that a speaker and cabinet are essential components of an electronic organ.

Defendant argues that *Montgomery Ward* is distinguishable from the facts disclosed by the incorporated record, and that the prior *Symphonic* case is *stare decisis* inasmuch as there has been no clear and convincing showing of error.

While a cabinet and loudspeaker are essential components of an *electronic organ (Montgomery Ward)*, the issue in the instant case is whether such components are essential to a *radio receiver* within the common meaning of that term. Reflecting the common meaning of the term "receiver" (as distinguished from "receiving set") is the following definition:

86 C.J.S. *Tel. & Tel., Radio & Television* § 293 (1954):

> *"Receiver;" "receiving set."* A "receiver" is commonly understood in the trade as including something more than a tuned radio frequency receiver; *it takes in what is called a chassis; in other words, a chassis plus tubes is a receiver in the trade sense of the word.* In that sense, the combination of the essential elements of a radio receiver, arranged and mounted, for commercial purposes, on a frame, called a "chassis", constitutes a receiver. [Footnote references omitted; emphasis added.]
>
> A "receiving set" comprises a receiver and some form of telephonic device; it may be said with some approach to accuracy that a receiving set consists of a receiver and a loud speaker. [Footnote references omitted.]

Additionally, *Encyclopaedia Britannica*, 1970 ed., Vol. 11, pp. 485–486, states:

> A "tuner" is employed for reception of radio broadcasts. The hi-fi tuner is simply a refined version of a radio receiver, but without audio amplifier or loudspeaker.
>
> \*     \*     \*     \*     \*     \*     \*
>
> \* \* \* [W]*hen a radio tuner is combined with an integrated amplifier, the resulting unit is referred to as a "receiver".* [Emphasis added.]

Significantly, too, the imported R860 stereo unit was described on the invoice as a "chassis". At 86 C.J.S. § 293, the term "chassis" with reference to radio receivers is defined as follows (at 302):

> *"Chassis."* A "chassis" is a metal structure on which the tuned radio frequency receiver *complete in all its elements, except its*

*tubes,* is mounted; it is the frame on which the essential elements of a radio receiver are, for commercial purposes, arranged and mounted. *The use of the word "chassis" connotes a radio receiver.* [Footnote references omitted; emphasis added.]

In *Radio Corporation of America* v. *Philadelphia Storage Battery Co.,* 23 Del. Ch. 289, 6 A. 2d 329 (1939), the Supreme Court of Delaware had occasion to consider the scope of the term "radio receiver", and whether a speaker and cabinet were essential components thereof, in determining the base on which royalties were to be computed under a license agreement granted by Radio Corporation of America. In this context, the court observed (at 333):

* * * A radio receiver is a device comprising apparatus that converts radio waves into sound waves of the same character as those emitted from the speech or music broadcast. The apparatus, when electrically energized, receives from the antenna radio frequency signals and transforms them into audio frequency signals. Thermionic valves or tubes are necessary. Electric power from dry cells, storage battery or generating plant is required; and where the alternating current from a generating plant is the source of electrical energy, a device known as a battery eliminator is made necessary in order to change the alternating current to a direct current. *The devices and contrivances, coils, electrical circuits and tubes, designed to receive, select and amplify sound, comprising the essential elements of a radio receiver, are, for commercial purposes, arranged and mounted on a frame, called a chassis, and the combination of the essential elements so mounted constitutes a receiver in the trade sense of the word. The use of the word "chassis" connotes a radio receiver.*

To reproduce the audio frequency signals so that they may be heard, some form of telephonic appliance is necessary. In the early days of the art, a head set was generally used. This device was followed by what is known as a loud speaker. There were, and are, loud speakers of many kinds and varying degrees of excellence. *While essential for the reproduction of sound to the ear in the absence of a telephone head set, a loud speaker is no part of the receiver.* A receiving set comprises a receiver and some form of telephonic device; and as the loud speaker is generally employed, it may be said with some approach to accuracy that a receiving set consists of a receiver and loud speaker.

*The case or cabinet in which the receiver is housed is not a necessary component of a receiving set, although the cabinet may be so constructed as to improve the sound.* A complete radio receiving set ready for immediate use by the purchasing public may be defined to be a combination of receiver, loud speaker, batteries or battery eliminator, tubes and other devices necessary or useful for satisfactory audible reception, including a cabinet in which the combination is installed. [Emphasis added.]

In addition to the foregoing legal and encyclopedic authorities, I have considered the testimony in the incorporated record, which is

relied upon by both parties.[2] Pertinent to the issue here of the essential components of a "radio receiver", as that term is used in the electronics industry, is the following testimony of Mr. Freeland on cross-examination (R. 69–71, 86–87):

Q. * * * If you have a product that has a tuner and also a power amplifier, would that, in your definition, be a radio receiver?—A. If it had a tuner and a power amplifier, it would be a radio receiver, with the addition of speakers, yes.

Q. Now, in your knowledge of the trade today, I assume that you feel that speakers are essential before you have something that's called a receiver?—A. *Not necessarily.* I feel that a receiver would consist of a tuning device, an amplifying device, and a power transformer or suitable energy to power the unit.

Q. Now, the R 835, do we have the tuner element in that particular item?—A. Yes, we do.

Q. And do we also have a power amplifier in that item?—A. Yes we do.

Q. Now, assuming, Mr. Freeland, that I had a transformer, a power transformer on that unit, and I wanted to operate the AM section, what would I need in addition to the transformer to make it do that?—A. You would need, in order to interpret it to your ears, you would need a speaker.

Q. And that is all?—A. And a suitable, of course, house current, voltage.

Q. And is the same true with FM?—A. The same is true of the functions of this, which is AM and FM.

\*        \*        \*        \*        \*        \*        \*

Q. Now, we take that R 835, which is Plaintiff's Exhibit No. 1. Let's assume that we have a power transformer with it. Is that not a tubeless radio receiver?

\*        \*        \*        \*        \*        \*        \*

A. As I would define a receiver, as it's known in the trade, it would have a case, a power transformer added to it, suitable knobs and a dial mechanism in order for the customer to be able to know what frequency and what station he was selecting. This way he has no knowledge.

Q. Where did [sic] those additions, that would be a receiver?—A. As it's commonly thought of, yes.

And on redirect examination, Mr. Freeland testified (R. 87–88):

Q. You have been asked a number of times whether the imported article would be a receiver if you had added a power amplifier. Will you explain whether any other wiring or other parts had to be added to the article before it would be a receiver,

---

[2] Mr. Freeland's testimony in the incorporated record is, in effect, incorporated in his affidavit by reference pursuant to the last paragraph of the affidavit which states: "I have read the printed transcript of my testimony in C.D. 4543 and if I was asked the same questions relative to the subject article, my answers would be essentially identical". It may be assumed that by having incorporated the entire record in the prior *Symphonic* case, defendant is relying upon the testimony of all the witnesses.

other than just the power amplifier?—A. In order to be a receiver, it would have to have all the equipment, *possibly with the exception of the speakers*. A case, turning knobs, dial, power transformer and certain connecting wires, at least two external receptacles on the back where one could plug in a speaker and accessory equipment. I would then consider that a receiver being capable of being plugged into the ordinary house current.

On further questioning by the court, Mr. Freeland stated (R. 89–90):

JUDGE NEWMAN: Why would it need a case, Mr. Freeland?

MR. FREELAND: I was speaking now of a receiver, as it would be, as it's commonly referred to on the market, is generally in a case to protect the customer from engaging in dangerous voltages.

\*    \*    \*    \*    \*    \*    \*

JUDGE NEWMAN: In other words, it's more than just a matter of physical appearance, you say?

MR. FREELAND: Oh, yes.

On direct examination, defendant's witness Fred Mergner [3] testified (R. 101–102):

Q. Mr. Mergner, could you tell us the difference between a radio tuner and a radio receiver?—A. A radio tuner, in the understanding of the hi-fidelity industry, is a particular section which is able to receive AM and FM transmissions and *a radio receiver is the combination of such a tuner plus an amplifying section*.

Q. Mr. Mergner, does a receiver have to have speakers in order to be a receiver in the industry?—A. Not necessarily. *A receiver is what I described before by itself*. However, in order to make the reception audible, you have to add speakers.

On direct examination, defendant's witness Robert A. Kulinyi [4] testified (R. 123, 127–128, 131):

Q. Does the schematic [of the imported R 835 tuner] indicate that it is a radio receiver?—A. It does.

Q. In your opinion, then, Mr. Kulinyi, based on what you have in the schematic diagram [of the imported R 835 tuner] is the imported merchandise a radio receiver?—A. In my opinion, it is a radio receiver.

\*    \*    \*    \*    \*    \*    \*

Q. Mr. Kulinyi, I show you now, Plaintiff's Exhibit 1 [the imported R 835 tuner] and I ask you if you had seen this exhibit prior to coming to Court?—A. Yes, I have.

Q. And in your opinion, Mr. Kulinyi, is this unit a radio receiver?—A. In my opinion, it is.

\*    \*    \*    \*    \*    \*    \*

[3] Mergner had been vice president of engineering for Fisher Radio since 1957 and had been in the field of electronics since 1938.

[4] Kulinyi was acting chief of the transmission technical area of the communications and automatic data processing laboratory of the U.S. Army Electronics Command, Fort Monmouth in New Jersey.

Q. What, Mr. Kulinyi, did you base your opinion on, in coming to the conclusion that this is a radio receiver?—A. I based it on the circuit diagram, in checking it and checking the elements of the circuit diagram against connections and the circuitry as it appears in Exhibit 1 and also the previous experience with Exhibit 2 and on my previous knowledge of receivers of this type.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. Mr. Kulinyi, in your opinion, are speakers properly part of a radio receiver?—A. No. Some receivers may be equipped with loudspeakers, but many of them are not.

It is apparent from the foregoing quoted excerpts from the stenographic transcript that concerning the essential elements of a "radio receiver" as it is known in the trade, Freeland's testimony sharply conflicts with that of Mergner and Kulinyi, except possibly with respect to loudspeakers, which all three witnesses seem to agree are not essential components of a receiver *per se*. Radio receivers are of such widespread and well known use that the court may take judicial notice of the fact that they are sold both with and without loud-speakers, and that frequently speaker systems are used with receivers that are not only external to the cabinet housing the receiver, but frequently are located at remote locations from the receiver itself.

Since plaintiff expressly relies upon the testimony of Mr. Freeland rather than on the court's findings of fact as set forth in C.D. 4543, this case is in the same posture as if the parties had submitted affidivits or depositions which were in disagreement on a material issue of fact. Fundamentally, summary judgment is a drastic remedy, and cannot be granted where there exists a triable issue. Here, predicated upon the testimony in the incorporated record—and the posture of the case—triable issues exist: concerning the essential components of a radio receiver, as that term is commonly understood in the electronics industry; and concerning whether a stereo "chassis" or tuner-amplifier of the type represented by the Model R860 was commonly regarded and sold in the trade as a "radio receiver". These issues of fact should be resolved after a plenary trial and not on cross-motions for summary judgment. Accordingly, the cross-motions are denied.