**MONTGOMERY WARD & CO., INC.,**
Appellant,

v.

**The UNITED STATES, Appellee.**

**Customs Appeal No. 74–7.**

United States Court of Customs
and Patent Appeals.

June 27, 1974.

Ralph A. Mantynband, Chicago, Ill., attorney of record, for appellant. Arvey, Hodes & Mantynband, Chicago, Ill., of counsel.

Irving Jaffe, Acting Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, Edward S. Rudofsky, Dept. of Justice, Civil Division, Customs Section, New York City, for the United States.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

RICH, Judge.

This appeal is from the decision and judgment of the United States Customs Court, 70 Cust.Ct. 193, C.D. 4430, 362 F.Supp. 560 (1973), which dismissed an

action challenging the classification of certain portions of an electronic organ as an electronic musical instrument, "Other," under TSUS 725.47 and claiming classification under TSUS 726.80 as "Musical instrument parts not specially provided for." We reverse.

The four articles imported were: (1) a bass foot pedal assembly; (2) a keyboard chassis assembly; (3) an amplifier and expansion pedal assembly; and (4) a reverberation unit. These components, or subassemblies, were imported together. They are sometimes hereinafter referred to as Exhibits 1, 2, 3, and 4.

The competing provisions of the Tariff Schedules are:

General Interpretative Rule 10(h): [U]nless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished[.]

Schedule 7, Part 3, Subpart A

Subpart A headnotes:

2. For the purposes of this subpart—

\* \* \* \* \* \*

(c) the term *"electronic musical instruments"* embraces all musical instruments in which the sound is generated electrically, and conventional-type instruments not suitable for playing without electrical amplification, but the term does not include conventional-type instruments, fitted with electrical pickup and amplifying devices, when the instrument is suitable for playing without such amplification.

3. The provisions of this subpart for string, wind, and percussion musical instruments include such instruments whether or not fitted with electrical pickup and amplifying devices. Such devices, however, are separately classifiable from the musical instrument with which imported unless such devices are, or are designed and in-

tended to be, fitted into or housed in the instrument itself.

\* \* \* \* \* \*

Electronic musical instruments

\* \* \* \* \* \*

725.47　Other ............17% ad val.

Schedule 7, Part 3, Subpart B

Subpart B headnote:

1. This subpart does not cover electrical pickup or amplifying devices or other articles which are provided for in part 5 of schedule 6 or part 2 of schedule 7.

\* \* \* \* \* \*

726.80　Musical instrument
　　　　parts not special-
　　　　ly provided for. .11.5% ad val.

The imported components, when assembled with other parts furnished in this country, became the Montgomery Ward & Co. electronic organ, Model 8931. Montgomery Ward imported the components, sold them to a company named Wellcor, Wellcor manufactured complete organs therewith, and sold them to Montgomery Ward, which sells them to the public.

The Customs Court opined that if the imported articles had been imported separately, or if less than *all* four of them had been imported together, the importations would "very likely" have been classifiable under Item 726.80 as parts of an electronic musical instrument. It deemed the question to be whether the unassembled imported components "were sufficiently complete to constitute, in their entirety, an article in the class of 'electronic musical instruments'."

The Customs Court found, and it is not disputed, that Wellcor assembled the imported components into a cabinet or case of American manufacture, with a loudspeaker (transducer) of American manufacture, using miscellaneous hardware of American manufacture. The evidence shows that the value of the imported parts was 47.10% of the production cost of the organ and that the parts

manufactured in the United States plus various other cost items including a profit were 52.90% of the cost. Notwithstanding the lower court's finding that cost items other than the cost of the imported components "represent more than 50 percent of what it costs to produce the electronic organ model No. 8931 for sale at retail," and a further finding that "when assembled, the imported articles are unable to generate an audible musical sound without a loudspeaker," it held the imported components to constitute an electronic musical instrument under item 725.47.

## OPINION

This being a classification case we are not limited to review of questions of law and can consider whether the lower court's findings of fact conform to the weight of the evidence. Appellee urges that there is "substantial evidence" to support the Customs Court's findings and, indeed, there is. But we also find there is even more substantial evidence to support appellant's contentions on critical questions of fact. We do not agree with appellee's suggestion that we are bound to accept the Customs Court's findings of fact *whenever* there is substantial supporting evidence, and we will not do so when they are clearly contrary to the weight of the evidence.

The first consideration in this case is whether the importation falls into the category of "Electronic musical instruments," which item 725.47 specifies. Headnote 2(c), above, defines this term as embracing "all musical instruments in which the sound is generated electrically." It is not disputed here that the importation ends up in an "electronic organ," Model 8931. Neither is it disputed that in that organ sound is generated electrically. It is also undisputed that two major parts of the Model 8931 organ as marketed are not among the imports, namely, the cabinet and the loudspeaker. The issue, therefore, reduces to a question of whether the importations, consisting of four major electro-mechanical organ subassemblies, constitute a *musical instrument* in an *unassembled* condition, namely, an organ. It is to that question that we now turn.

The Government's case for the affirmative is built entirely on a courtroom demonstration put on by its two witnesses and their testimony. One of the witnesses, John Ogle, with three or four years of experience as an organ repairman, took three of the four imported subassemblies or components, omitting the reverberation unit, and made the intended electrical connections between them. He then testified that, if "plugged in and played," "electronic vibrations" would be present but that they would not be audible unless a loudspeaker was added to the assembly. Government counsel then had Ogle connect a loudspeaker and plug in the assembly. The Government then called its second witness, Dennis Halasz, a freshman music student at the University of Illinois, who said he had played electronic organs like the Model 8931, which was also in the courtroom, and he improvised "Blues in G minor" on the hooked-up plugged-in assembly of the imported parts with added speaker. It has been said that "music hath charms," and this demonstration appears to have had a siren-song effect at the trial stage.

After Mr. Ogle testified that the components of an electronic organ are tone generators, keying systems, voicing systems, amplifying systems, and a *speaker*, he testified further on direct examination, in effect, that an electronic organ without a speaker is still an electronic organ. This, of course, is the ultimate *legal* question in this case, and the testimony was that of a repairman with no knowledge of customs law. On cross-examination Mr. Ogle testified as follows:

By Mr. Mantynband:

Q. Without this speaker, Exhibit No. 5, can the four parts over there make music as an electronic musical instrument (indicating)? A. You won't hear any sound.

Q. Can they make music? A. You won't hear it.

Q. They can't make music, can they? A. Not if you are considering hearing.

Q. Is there any other form of music other than hearing? A. That's up to you; I don't know.

Q. Do you know of any other form besides hearing? A. No.

Q. That's the only form of music there is, that which you can hear? A. Yes.

Q. Music you can't hear isn't music, is it? A. You can't hear it.

Q. Well, it's not music, is it? A. I suppose not.

Along similar lines, Mr. Ogle testified that with the four imported subassemblies you have an electronic organ, even without the cabinet because "You've got all the basic elements for an electronic organ *on the table.*" (Emphasis added.) On cross-examination, Mr. Ogle testified:

Q. Now, you testified that you were able to exercise a judgment as to whether Exhibits 1, 2, 3, and 4 were or were not an organ as they stand on the court's exhibit table. A. Yes.

Q. Do you recall that testimony? A. Yes.

Q. Will you tell us what you have had to do, in your entire life, with the manufacturing of an organ? A. None.

Q. I cannot hear you. A. I said, "None."

Appellant's witness Wilkerson, Montgomery Ward's musical instrument buyer, a professional musician without formal electronics education, testified, inter alia, that he could not sell the imported components "as an organ," that one of the most important influences on the musical qualities of an organ is the cabinet and speaker design, that the speaker used in Model 8931 is of American manufacture, that the speaker is the only part of the organ that generates sound (which seems more than a little ob-

vious), that the imported components, as imported, are not a musical instrument, that before the importation can be functional as an organ "There would have to be additional parts and wiring and a cabinet and a speaker," and that without the cabinet and the speaker "there is no sound; there is no organ."

Appellant's witness Gene Morez was the director of engineering at Electronic Sound Corporation which built Model 8931 organs until that operation was transferred to a related company of some kind, which is Wellcor. He had been a senior product engineer at two other organ companies, Lowry and Thomas. He testified, inter alia, that the four imported subassemblies could not, "of course" function as an organ without further manufacturing. His direct testimony is concise and highly significant on the issue before us. We reproduce it:

Q. Now, as Plaintiff's Exhibits 1, 2, 3, and 4 arrive in the United States, are they, in your opinion, able to function as an organ without further manufacturing? A. No. Of course not.

Q. Further manufacturing is required? A. The cabinet is an intrinsical part of an organ. The whole tonality of an organ is based on the cabinet and speaker system selected for it. The frequency range of any given instrument, and the organ is [as] an instrument, is dependent on a character of sound that you want out of it.

This particular organ has low frequency in the pedal tones of 32 cycles per second. It requires an awful lot of power, in the area of 25 watts rms to reproduce that low a frequency in an audible level. And if the speaker was not mounted in the cabinet, the cone would literally just pump a small volume of air. The cabinet, however, coupled to the baffle element of the cabinet, will now make this sound audible. So that cabinet, which holds the tray, which holds the pedal clavier,

which incidentally is made to a musician's standard, called the American Guild of Organists—A.G.O. specs'—is required to hold the various components and parts that are put into that cabinet in such a fashion that a person that is experienced in any such fashion with playing an organ can sit down at this unit and feel comfortable at it as the instrument it is.

There are certain locations for that pedal clavier in relationship to the keyboard. There are also certain relationships of that volume control to the keyboard. And if those relationships are not held from one organ to another organ to another organ, there wouldn't be any similarity to the term "organ" it would be an instrument of its own. So the cabinet in any one of these type of devices is very, very important to its tonal features.

This testimony was not shaken on cross-examination, from which we extract the following:

By Mr. Henry [Government counsel]:

Q. Now, I would like to go to the veneer cabinet which plaintiff refers to, and just ask you one more thing.

Is the veneer cabinet used for tonal quality purposes, too? A. Yes, it is.

Q. Could you elaborate on that? A. The quality of the wood that makes the cabinet up has a typical reasonance [sic] or resonant quality which adds a warmth of sound to it, that given a plastic cabinet or something else may not have, but the fact is that it's also a baffle for the speaker. It is the baffle for the speaker compartment that makes the speaker work more efficiently. Any speaker, any given speaker, just held in the air, will produce a sound, but the sound will be limited in range and quality; no low frequency would come out of it because it isn't doing any work. It must be applied to or installed in a baffle—hence, the cabinet, to reproduce these low frequencies—and an organ, by nature, of its own name, must produce low frequencies.

Q. Then the veneer cabinet is used mainly for the purpose of the speakers. A. But, as I pointed out before, it also holds these other components in a specified area.

After review of the entire testimony and with the aid of the exhibits, we are clearly of the opinion that the imported subassemblies, when assembled as was done in the courtroom, do not constitute an electronic organ in the common meaning of that term and therefore do not constitute a musical instrument. They cannot, therefore, be classified under item 725.47. One reason is that two parts of major importance must be added to create an electronic organ, namely, a coordinated cabinet and loudspeaker. Another reason is that to have a musical instrument known as an organ, which can be played upon in conventional fashion by a musician trained as an organist, three of the four imported components which are manipulated by the organist, namely, the keyboard, the bass foot pedal, and the foot-operated swell pedal, must be properly located by means of their mounting in and attachment to the cabinet so as to be in the positions where an organist, by his training, expects to find them. As we understand the courtroom demonstration, in which the witness was able to produce music from three coupled components, they were simply laid on the table or possibly on both the table and the floor, in which arrangement they were far from being what anyone would call an organ in the usual sense. The testimony of knowledgeable experts, moreover, contradicts Mr. Ogle's statement that *all* the basic components of an organ were imported. It is clear to us that the cabinet and speaker are basic elements of an organ.

We have carefully considered the reasoning which led the lower court to find that the cabinet is not an essential component of an electronic organ but are constrained to disagree with it. Familiarity with the court's opinion will be presumed. We do not consider it significant that dictionaries, in defining or-

gans in general, fail to mention cabinets. The cases cited do not seem in point. We find no significant evidence in the record that organs of the type in which the importations are used are ever sold without cabinets. It does not follow from the fact that the current-generating electrical parts characterize the organ as "electronic" that the cabinet is not essential; nor does it follow from the fact that the cabinet per se does not "advance the imported articles to the condition of an *electronic* organ." (Emphasis ours.)

With respect to the lower court's reasoning that the loudspeaker is not essential to the existence of an electronic organ, we find fundamental error in the lower court's premise that the speaker does not contribute "to the manner in which the sound is generated * * *." We find this same flaw in appellee's argument. The assumption is that the imported electronic components generate "sound" and that the speaker merely makes it audible. The imported components do not generate sound, as the evidence shows and as is well known; they generate electrical currents only. The speaker, which can also be characterized as an electrical device, since it is actuated by the electrical currents fed to it, acts as a transducer to convert electrical energy into sound. Until this occurs, there is no sound. We therefore have to disagree with the lower court's conclusion that the courtroom demonstration "effectively dramatized" how the imported components, when assembled, "generated sound electrically." They generated nothing more than electrical currents and there was no sound but for the added loudspeaker, which was not among the imported articles. We deem it essential to its classification as a "musical instrument"—in the absence of some indication of legislative intent to the contrary—that there be a capability in an organ of producing sound when played upon.

We therefore conclude that the imports were not properly classified under item 725.47. The record establishes be-yond question that they are, however, "parts" of electronic musical instruments, and no question has been raised as to such parts being properly classified under item 726.80.

### The Assignment of Error Question

Appellee has raised a question about the adequacy of the assignment of errors in the notice of appeal to this court to "preserve for review the issue of whether an unfinished electronic musical instrument must be capable of producing audible sound * * * in order to be classified as an electronic musical instrument for tariff purposes." It will be recognized that said issue goes to the very essence of this appeal. The assignments of error read as follows:

2. *Concise Statement Of Errors Complained Of:*

(a) The judgment is contrary to the evidence;

(b) The judgment is contrary to the law;

(c) The judgment is contrary to the manifest weight of the evidence;

(d) The Court erred in permitting the Court's government witnesses Ogle and Helasz to testify as to opinion evidence;

(e) The Court erred in receiving over plaintiff's objection evidence introduced by the defendant concerning the opinions of the defendant's witnesses that the imported articles constituted an electronic organ.

Appellee cites United States v. Fisher Scientific Co., 40 CCPA 164, C.A.D. 513 (1953), in support of the proposition that the errors should be more specifically stated on penalty of any error not so stated not being considered. In *Fisher* the court declined to consider certain vaguely broad assignments of error not only because they were broad but also because "of the almost complete absence of any reference to alleged errors with respect to this importation in the brief and oral argument of appellant." At the same time, the court prefaced its discus-

sion of the point by saying it "is not disposed to be technical upon this subject."

That was over twenty years ago and there has been a change in attitude in this court on the subject of assignments of error, particularly on the patent side of our jurisdiction where the corresponding provision is for "reasons of appeal" and the question has been more frequently raised. For cases involving liberal construction of the reasons of appeal provision see, In re Howell, Jr., 49 CCPA 922, 298 F.2d 949, 132 USPQ 449 (1962); and In re Arnold, 50 CCPA 1166, 315 F.2d 951, 137 USPQ 330 (1963). See also the dissenting opinions in In re Gruschwitz, 50 CCPA 1498, 320 F.2d 401, 138 USPQ 451 (1963). We point out that appellee has been at no disadvantage in this case by reason of the breadth of the assignments of error since appellant's arguments were made below and were fully made known to it in appellant's brief in this court. We also note the fact that, under the Federal Rules of Appellate Procedure, Rule 3, in other Federal Courts of Appeal *no* assignment of errors is required, nor has one been required ever since adoption of the Federal Rules of Civil Procedure. The statute, 28 U.S.C. § 2601(b), now somewhat anachronistic, still requires assignments of error and, consequently, this court's Rule 3.1(b) does likewise. But, even as we said in 1953, we are not disposed to be technical about them since they really serve no useful purpose. We hold the errors assigned in this case sufficient to preserve all issues argued for review. The errors stated go to the whole decision of the Customs Court.

### Conclusion

The decision and judgment of the Customs Court is reversed.

MILLER, Judge (concurring).

The following statement in the majority opinion (with which I concur) should be amplified: "We find no significant evidence in the record that organs of the type in which the importations are used are ever sold without cabinets." The inference is that the decision would have been different if such evidence had been present. However, in Authentic Furniture Products, Inc. v. United States, 486 F.2d 1062, 61 CCPA ——, C.A.D. 1109 (1973), there was ample evidence that the importations involved were advertised and sold without "essential" parts, but the majority, nevertheless, held that the importations constituted less than the completed article because the missing parts were "essential." Judge Rich and I dissented, finding that the missing parts were not "essential" in the *commercial* sense, as distinguished from the *functional* sense; also that the missing parts were not "substantial" for purposes of the test of "substantial *and* essential" laid down in Twin Pin Co. of U.S.A., Inc. v. United States, 24 Cust.Ct. 430, Abstract No. 54254 (1950). Here the cabinets and loudspeakers were essential in both the commercial and functional sense; also they were both substantial *and* essential.