**The UNITED STATES, Appellant,**

v.

**The TWIN WINTONS, Appellee.**

**Customs Appeal No. 75–29, C.A.D. 1171.**

United States Court of Customs and Patent Appeals.

June 10, 1976.

Rex E. Lee, Asst. Atty. Gen., Washington D.C., Andrew P. Vance, Chief, Customs Section, Velta A. Melnbrencis, New York City, for the United States.

Edward N. Glad, Glad, Tuttle & White, Los Angeles, Cal., attorney of record, for appellee.

Lamb & Lerch, New York City, attorneys of record, for amicus curiae; David A. Golden, New York City, of counsel.

[Oral argument on February 4, 1976 by Velta A. Melnbrencis, New York City, for appellant and by Edward N. Glad, Los Angeles, Cal., for appellee.]

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

RICH, Judge.

This appeal is from the judgment of the Customs Court, 74 Cust.Ct. 115, C.D. 4594, 395 F.Supp. 1397 (1975), sustaining appellee's claim that its imported ceramic decanters are dutiable under the Tariff Schedules of the United States (TSUS), as modified by T.D. 68–9, item 533.31, as fine-grained stoneware articles at the rate of 8¢ per dozen plus 20% ad valorem for the entries made in 1969 and 7¢ per dozen plus 17% ad valorem for the entries made in 1970. The merchandise was classified under TSUS item 533.71 as articles of nonbone chinaware and assessed with duty at the rate of 36% or 31% ad valorem, depending on date of entry. We reverse.

The merchandise was invoiced as "Hillbilly Decanters" and tops, or "Rebel Yell Decanters" and tops. The parties stipulated that it is fine-grained ceramicware, that all of the merchandise is identical in composition and production, that no color additives were used prior to the addition of any glaze in the production of the decanter bodies, and that the bodies absorb less than 0.5 percent by weight of water when tested according to the procedures set forth in ASTM C373–56, the test method prescribed in Schedule 5, Part 2, headnote 2(k).

Schedule 5, Part 2, TSUS, in pertinent part, reads as follows:[1]

1. Neither the parties nor amicus curiae (representing the United States Potters Association, of East Liverpool, Ohio, domestic manufacturers of ceramic wares, chinaware, earthenware, stoneware, etc.) have argued the question whether the imported merchandise is fully vitrified.

*Part 2 headnotes:*

1. This part covers ceramic wares, and articles of such wares and, in addition, certain unshaped refractory material (subpart A) closely related thereto.

2. For the purposes of the tariff schedules—

\* \* \* \* \* \* \*

(c) the term *"stoneware"* embraces ceramic ware whether or not glazed or decorated, having a fired body which contains clay as an essential ingredient, is not commonly white, will absorb not more than 3.0 percent of its weight of water, and is naturally opaque (except in very thin pieces) even when fully vitrified; [1]

\* \* \* \* \* \* \*

(e) the terms *"chinaware"* and *"porcelain"* embrace fine-grained ceramic ware (other than stoneware), whether or not glazed or decorated, having a body which is white (unless artificially colored) and will not absorb more than 0.5 percent of its weight of water;

(f) the term *"bone chinaware"* embraces chinaware or porcelain the body of which contains by weight 25 percent or more of calcined bone;

(g) the term *"nonbone chinaware"* embraces chinaware or porcelain other than bone chinaware;

\* \* \* \* \* \* \*

(i) the term *"fine-grained"*, as applied to ceramic wares, embraces such wares having a body made of materials any of which had been washed, ground, or otherwise beneficiated; and

(j) the term *"body"* includes any engobe or body slip, except engboge or body slip applied to the body as a decoration; \* \* \*

\* \* \* \* \* \* \*

*Subpart C.—Table, Kitchen, Household, Art and Ornamental Pottery*

\* \* \* \* \* \* \*

Articles chiefly used for preparing, serving, or storing food or beverages, or food or beverage ingredients:

\* \* \* \* \* \* \*

Of fine-grained earthenware \* \* \* or of fine-grained stoneware:

\* \* \* \* \* \* \*

Not available in specified sets:

| | | |
|---|---|---|
| 533.31 | Steins, mugs, candy boxes, decanters, punch bowls \* \* \* ....... | 8¢ per doz. pcs. + 20% ad val. [or] 7¢ per doz. pcs. + 17% ad val. |

\* \* \* \* \* \* \*

Of nonbone chinaware or of subporcelain:

\* \* \* \* \* \* \*

| | | |
|---|---|---|
| 533.71 | Steins, mugs, candy boxes, decanters, punch bowls \* \* \* ....... | 36% [or] 31% ad val. |

The record consists of the testimony of two witnesses and four exhibits offered on the importer-appellee's behalf, and the testimony of three witnesses and two exhibits offered on appellant's behalf. Appellee's Exhibit 1 is a "Hillbilly" decanter identified as representative of the imported merchandise. It is elaborately decorated with glazes of various colors. During the trial it was broken to enable appellant's witnesses to testify about the color of the decanter body, beneath the glaze.

Appellee's first witness, Ross H. Winton, was associated with his twin brother, owner of appellee, The Twin Wintons & Associates. He was involved in the negotiations with the Japanese manufacturer of the decanters. He testified that though appellee desired to import porcelain decanters, the Japanese manufacturer indicated it was not set up for porcelain manufacture and suggested instead the use of stoneware which would not be white but off-white in color. The order was placed following approval by appellee's customer. Winton testified that neither he nor appellee specified what materials were to be used in the manufacture and the he did not know what went into the composition of the decanters.

Appellee's other witness, Lewis F. West, was employed by the United States Testing Company, an independent testing laboratory, as a chemist and laboratory supervisor. He stated that he had experience in testing chinaware and stoneware and that he supervised the testing of the head portion of one of the imported decanters sent to his company by Winton. He identified the report of the testing, plaintiff's Exhibit 2, which he said he had read and approved.[2] He stated that he personally had performed the water absorption test and that, from a physical examination of the sample body, "We found the material to be clay, to be opaque, and to be an off-white." He admitted that the report said the color of the body is "white" and added: "Yes, the body is white. It is an off-white. It does not come up to a hundred percent white." He said the test for color was visual: "We simply looked at it." Water absorption was found to be less than 0.3%. Metal content determination was farmed out to another laboratory for spectrophotographic analysis which showed silicon 29%, aluminum 14%, calcium 1.9%, potassium 3.0%, and sodium 1.7%, accurate within the range of 10%.

The conclusion of the report, which conforms to West's testimony, is:

> Since the color (white) and water absorption (less than 0.3%) of the sample material is in the range of both stoneware and porcelain, the determining factor is the opacity of the material.
>
> The submitted sample is opaque and therefore classified as stoneware.

That, in sum, is appellee's case.

Appellant's three witnesses were persons experienced in various phases of the ceramics industry. Harry W. Thiemecke had worked as an engineer for Westinghouse Electric Company on porcelain insulators and afterward, until he retired, for Homer-Laughlin China Company. Clifford R. Stowell, Jr., was currently vice president of Western Stoneware Company, manufacturer of bean pots, whiskey jugs, dinnerware, bowls, cups, mugs, and jars. He had much prior experience in the field with other manufacturers. But, he said, he was not an expert on stoneware body composition. Edith Heath was an artist-ceramicist who had studied and taught in the field and had had her own company, Heath Ceramics, since 1947, manufacturing a variety of stoneware articles. We find it unnecessary to examine in detail the testimony of these government witnesses.

The Customs Court, after reviewing the stipulated facts, the evidence, and the arguments of the parties and the amicus, noted that classification is controlled by the statutory definitions contained in the headnotes, quoted above. It discerned three factors to be considered: the whiteness of the body, whether clay is an essential ingredient of the body, and the opaqueness, or otherwise, of the body.

On the question of the color of the decanter body, the Customs Court concluded that it is not determinative of whether the decanter is classifiable as chinaware or stoneware because the phrase "not commonly white" in the headnote 2(c) definition applicable to item 533.31 "does not preclude the possibility that stoneware bodies may fire white." The court noted that the color of a stoneware body appeared, on the evidence of record, to be a function of the potter's intention, manifested through ingredient control, stating:

> And this is apparently reckoned with in the statutory language "not commonly white", which certainly leaves the door open for the admittance of white-bodies [sic] stoneware, whether a visual exami-

**2.** Exhibit 2, the test report, is addressed to "Twinton, Inc." It identifies the sample tested thus:

> One sample was submitted and identified by the Client as the "head" of a decanter. The "head" is that of an old man with a beard and wearing a hat. The top of the hat is the pour spout.

As indicated above, Exhibit 1 is a decanter which has been broken and the parts collectively are now Exhibit 1. The head portion conforms to the Exhibit 2 description of the sample sent to the laboratory.

nation leads one person to describe an article as "white" or "off-white".

As for meeting the headnote 2(c) requirement that stoneware "contains clay as an essential ingredient," the Customs Court found that the evidence shows the main part of the body to be clay material and therefore held that the merchandise has clay as an essential ingredient.

On the third point, opaqueness, the Customs Court said:

> All of the witnesses, for both the plaintiff and the defendant, conceded that exhibit 1 is opaque.

On that assumption, the court decided the case, holding that because the merchandise has clay as an essential ingredient, is off-white in color, and is opaque, it is within item 533.31 and classifiable as fine-grained stoneware.

## OPINION

■ We are in full agreement with the conclusions of the Customs Court on the first two points, that the decanter body is white or off-white but that classification cannot be determined on the basis of whiteness, and that the decanter body contains clay as an essential ingredient. We are constrained to disagree with its finding of opaqueness on the basis of the evidence of record and reverse the decision on classification for that one reason.

Our first point of disagreement is with the finding that all the witnesses conceded that Exhibit 1 is opaque. As the court noted, there were five witnesses. Ross Winton said nothing about opaqueness. West said the sample he tested was opaque and introduced a report of his company which so stated. That report, Exhibit 2, gives no information on how the sample was determined to be opaque other than to say that it was "visually examined * * * for opacity/translucency characteristics." Thiemecke testified on cross-examination about an examination he made on the witness stand, as follows:

> Q. Mr. Thiemecke, only one question. In your opinion, looking at Exhibit 1, is it translucent or opaque? A. Translucency is a function of thickness.
>
> MR. GLAD: Would the witness be asked to be responsive to the question?
>
> Q. Is it translucent or opaque? A. I would like to have a source of light, if I may. The object that I have in my hand, including the glaze, is opaque.

The record fails to show whether Mr. Thiemecke was supplied with a source of light and, if so, what it was, or what the lighting in the courtroom was, or how the witness examined the exhibit. All the record shows as a basis for Thiemecke's opinion is what is quoted above. Mr. Stowell gave no testimony on the question of opaqueness. Mrs. Heath, the last witness, gave the following testimony on cross-examination:

> Q. How thin do you think Exhibit 1 is? A. Oh, I would say it averages about $\frac{3}{16}$ths.
>
> Q. Would a chinaware plate that is $\frac{3}{16}$ths thick be translucent? A. Some could be.
>
> Q. Would you tell me whether or not that [Exhibit 1] is translucent? A. I can't.
>
> Q. Why not? A. I don't have enough light, and it is too thick. This is not typical.
>
> Q. You are saying that it is not translucent? A. I can't tell.
>
> MR. AST [for the Government]: Your Honor, she didn't say it was not translucent. A. (Continuing) If I could have a 500 watt bulb and could find a real thin section in here, I might be able to tell you. Otherwise, I can't.

On the foregoing evidence, we fail to see, as the Customs Court saw, that all of the witnesses conceded that Exhibit 1 is opaque.

■ At the conclusion of the case, plaintiff's attorney, in a colloquy with the court, made this statement:

> And it is our contention that the only difference between stoneware and porcelain ware is the translucency or opaqueness of the two articles.

He introduced exhibits and testimony to establish opaqueness, the controlling characteristic. He concluded his brief in this court with this paragraph:

As to the opacity of the decanters herein, not only does the unrebutted testimony of record show that the body of exhibit 1 is opaque (West, R–25; and Thiemecke, R–37), a visual examination of exhibit 1 will show that it is opaque. In this respect, exhibit 1 can be a very potent witness. *United States v. Halle Bros. Co.,* 20 CCPA 219, 221, T.D. 45995 (1932).

This court has so often repeated the statement for which the *Halle* case is cited as to make it axiomatic. See R. Sturm, *A Manual of Customs Law* 394 (1974). Wrapped in the words of this one paragraph is the ultimate in irony and the denouement as to what the decanters are made of. Exhibit 1 (the sample decanter) is indeed a very potent witness; visually examined, pursuant to appellee's invitation, it contradicts all other evidence that it is opaque.

How does one examine for opacity? As the report, Exhibit 2, implies, the opposite of opacity is translucency, a word derived from the Latin "translucere" meaning to shine through. The definition appropriate here is given in *Webster's New International Dictionary* (2d ed. 1937) as follows:

3. Specif. and usually, admitting passage of light but diffusing it so that objects beyond cannot be clearly distinguished; partly transparent; as *translucent* glass is unsuited for most windows.

The *Random House Dictionary of the English Language* (1967) defines translucent thus:

1. Permitting light to pass through but diffusing it so that persons, objects, etc., on the opposite side are not clearly visible (distinguished from *opaque*) * * *.

As defined in a more technically oriented dictionary, *Hackh's Chemical Dictionary* (3d ed. 1944):

*translucent.* Semi-transparent; permitting the partial passage of light.

To determine whether the decanter sample, Exhibit 1, is opaque one must therefore find out whether light—ordinary visible light—will pass through it, partially, being diffused in its passage. Nothing in the record tells us exactly how translucency tests were or should be conducted or that translucency and its opposite, opacity, have any special meaning in customs law. Appellee introduced part of a china plate (Exhibit 3) which was tested by the Bureau of Customs laboratory at San Pedro, California, and reported to be translucent except for 25% of the foot, due to thickness. How it was tested is not disclosed. Exhibit 1 was tested for the account of appellee, as Mr. West testified, by United States Testing Company, Inc., California Division. The report, Exhibit 2, states only that "the submitted sample is opaque." The only explanation of what the test for opaqueness was is that it was "Visual Examination." Mrs. Heath was asked on cross-examination whether Exhibit 1, which she accurately estimated to be about three-sixteenths of an inch thick, was or was not translucent. She said she could not tell because she did not have enough light; that if she could have a 500-watt bulb she might be able to tell if she put it down inside the decanter and could find a "real thin section." There is no evidence that any part of the decanter is "real thin," or "very thin" as headnote 2(c) says, and the sample does not show any such part.

Appellee's challenge to the court in its brief is that by "visual examination" we can see that Exhibit 1 is opaque. Accepting the challenge and using sources of visible light consisting of a penlight type of flashlight powered by two "AA" cells and a Christmas tree bulb of white glass of approximately 7 watts (not 500), our "visual examination" shows that Exhibit 1 has a translucent body. It clearly is not opaque. Our examination involved the elementary operations of taking the pieces of the broken decanter, Exhibit 1, into a dark room, placing each light source inside the hollow bodies, and observing the visible light which penetrates or passes through the bodies. This required no more technical ability or training than is necessary to enable one to

recognize light when it is present. Considerable light passes through Exhibit 1 from the aforesaid relatively weak sources of light; therefore, it is translucent rather than opaque, and on appellee's theory of the case it is not classifiable as stoneware.

To give additional illuminating detail, we make these further observations. On the essentially flat bottom of Exhibit 1, which is of a cream color, is some writing.[3] The 7-watt bulb inside the decanter produces sufficient luminosity of the base in a darkened room to enable the observer to clearly read all of the writing by the transmitted light. When the penlight flashlight, which produces a spot of light, is moved about inside the decanter adjacent the base, the location of the light is clearly visible through the base. The 7-watt bulb, placed inside the head of the "Hillbilly" decanter, all light being masked off save that transmitted through the body, clearly illuminates all of the hillbilly's features.[4] All of the foregoing phenomena of translucency have been observed by all members of the court. The potent witness, Exhibit 1, though silent, appears to be irrefutable and a complete refutation of all other evidence of record on alleged opacity. Since, on the present record, the one proposition not open to dispute and not contested by anyone is that if the imported decanters are *not opaque* they *cannot* be stoneware, there is no reason to consider any other question.

■ Appellee's burden of proof was to show that its importations are "stoneware" under the TSUS definitions. It endeavored to carry that burden by trying to establish opaqueness. It failed primarily because the evidence shows translucency; secondarily, having failed to introduce any evidence that the imported decanter has any "very thin" section, and Exhibit 1 indicating the contrary, the translucency cannot be explained by thinness. Finding, as we do, that appel-

lee simply failed to sustain its burden of proof does not raise any new issue.

The judgment of the Customs Court is *reversed.*

MILLER, Judge (concurring).

The members of the court having observed that Exhibit 1 is translucent, the majority premises its decision on "the one proposition not open to dispute and not contested by anyone," namely: that if the imported decanters are not opaque they cannot be stoneware.

However, Schedule 5, Part 2, headnote 2(c) states that stoneware is "naturally opaque (except in very thin pieces)."

Thus, the majority is in error in either of two respects: (1) Just because no one contests the stated proposition that if the imported decanters are not opaque they cannot be stoneware is no license for this court to fail to apply the statute in full by considering the provision "except in very thin pieces"; or (2) If the majority is holding that Exhibit 1 is not a very thin piece, it has, sua sponte, decided a new issue, not raised before or decided by the Customs Court and not argued before this court, against appellee. *Cf. Anderson Organization v. United States,* 46 CCPA 47, C.A.D. 694 (1958); *United States v. Hirschberg,* 42 CCPA 61, C.A.D. 571 (1954). See also *McGrath v. Manufacturers Trust Co.,* 338 U.S. 241, 249, 70 S.Ct. 4, 94 L.Ed. 31 (1949); *Kelley v. Everglades Drainage District,* 319 U.S. 415, 421–22, 63 S.Ct. 1141, 87 L.Ed. 1485 (1943).

The majority states: "There is no evidence that any part of the decanter is 'very thin.'" Perhaps this statement implies that appellee has not carried its burden of proving that Exhibit 1 is a very thin piece. If so, this too would be a new issue.

The dilemma confronting the majority and the frustration revealed in the dissent-

---

**3.** The writing is in black and appears to be, or to be covered by glaze. It reads "Original Design from the Cabin Still Collector's Gallery 1969" plus a central mark reading "Stitzel Weller Distillery."

**4.** The features are apparently painted on with glaze of unspecified composition in various flesh tones and brown with black eyes. The glaze variably reduces the amount of light transmitted.

ing opinion could be avoided by merely taking a basic approach to statutory interpretation. The source of the error of the Customs Court and of the majority and dissenting opinions is the assumption that, because the evidence shows the merchandise has clay as an essential ingredient, *any* clay will do for purposes of Schedule 5, Part 2, headnote 2(c). However, it would be absurd to imagine that the words "contains clay as an essential ingredient" manifests a Congressional intent to permit use of clay, the composition of which would not produce what is commonly and commercially known as "stoneware."

In Schedule 5 *Tariff Classification Study* 79 (1960), the following discussion appears:

> The definition of "stoneware" (headnote 2(c)) has been modified. Objection was made at the hearing to the provision that stoneware has a body which contains by weight 50 percent or more of "stoneware clay". Doubt was expressed of the general acceptance of the term "stoneware clay", as identifying any specific type of clay, and attention was directed to potential administrative and interpretive problems which could result from the definition. The consensus of all who expressed opinions is that stoneware has a body which is usually, though not always, impervious to water, and which is opaque, except in very thin pieces. A subsequent opinion was expressed that the body of stoneware may have a water absorption of as much as 3.0 percent. The proposed definition reflects these opinions.

Thus, the legislative history shows that the requirement that stoneware have a body containing "stoneware clay" was abandoned because there was doubt over the general acceptance of that term as identifying any specific type of clay. There can be no doubt, however, that the clay used must

produce what is commonly and commercially known as "stoneware." [1]

The record before this court shows without contradiction that the clay from which Exhibit 1 was made is not a type which produces stoneware. The unrebutted expert testimony of Mrs. Heath was that stoneware is manufactured "only from fire clay or iron bearing ball clays and not from white clays"; further, that fire clay always contains iron and usually titanium. Thiemecke, another expert witness, when asked whether he had ever done any work with fire clay, answered:

> Yes, I have done some work on it. . . . I was investigating the development of stoneware bodies. There we used fire clays and some ball clays for this work.

He further testified that iron is always found in fire clay. He was asked, "What color does a fire clay fire?" His answer was:

> This is a function of the firing. Now, if you fire in an oxidizing condition you get an ivory to a tan color, or it could go red, depending upon how much iron was in the clay. If you fire in a reducing condition, then you would throw it over to the gray side.

The Customs Court gave its opinion that the color of the imported decanters is not determinative of whether or not they are susceptible to classification under item 533.-31, TSUS, because of the phrase "not commonly white" in headnote 2(c); that the phrase implies the possibility that stoneware bodies may fire white, although the bulk of stoneware articles usually possess non-white bodies. Notwithstanding appellant's argument that the phrase "not commonly white" is but an understatement of the words "not white," the phrase appears to represent recognition by Congress of the possibility that a stoneware body might be

---

1. In the *Tariff Classification Study, supra,* at 263, appears the following statement by Mr. J. Bradley Colburn, an attorney representing an association of 13 importers of English earthenware and chinaware:

> The types and amount of clay used in making stoneware differ so as to make the proposed test, based on amount of clay of any description used therein, wholly impracticable. The only sound test would seem to be that which has existed heretofore; namely, to classify as "stoneware" products which are commonly and commercially so known.

*Cf. United States v. Oakville Co.,* 56 CCPA 1, 8, C.A.D. 943, 402 F.2d 1016, 1021 (1968).

white (*e. g.* colored white). As noted in Schedule 5 *Tariff Classification Study* 100 (1960), the predecessor provision for stoneware was paragraph 211 of the Tariff Act of 1930, ch. 497, Pub.L.No.361, 46 Stat. 603–04, which read in part as follows:

Par. 211. Earthenware and crockery ware composed of a nonvitrified absorbent body, including white granite and semiporcelain earthenware, and cream-colored ware, terra cotta, and stoneware . . .; plain white, plain yellow, plain brown, plain red, or plain black, not painted, colored, tinted, stained . . . 10 cents per dozen pieces and 45 per centum ad valorem; painted, *colored*, tinted, stained . . . 10 cents per dozen pieces and 50 per centum ad valorem. [Emphasis supplied.]

Thus, the possibility of a white-colored stoneware was provided for.[2] The change in language to "not commonly white" in the TSUS was unaccompanied by any suggestion of intent to foreclose the possibility that stoneware might be white. However, as set forth earlier, the record before this court negates the Customs Court's suggestion that there could be an absence of iron or titanium in the clay from which a stoneware body is composed so that it would fire white.

The Customs Court concluded that appellee had established that classification of the imported merchandise as chinaware was improper by distinguishing chinaware and stoneware and by showing that the merchandise is stoneware. I do not agree that appellee has distinguished chinaware and stoneware. Although stoneware, for purposes of item 533.31, TSUS, must be fine-grained, so must chinaware. The Customs Court said that the test report of the United States Testing Company was "some evidence" that clay is an essential ingredient of appellee's merchandise, as required by the TSUS definition, but clay can be an essential ingredient of some chinaware (the TSUS definition does not require "clay as an essential ingredient").[3] Although the TSUS definition of stoneware does not preclude its being white, chinaware has a white body (unless colored). Finally, although stoneware is "naturally opaque (except in very thin pieces)," the unrebutted evidence shows that some chinaware (*e. g.* dinnerware for hotel and restaurant use) is opaque. This is where the argument of appellee, both before the Customs Court and on appeal, that translucency distinguishes chinaware from stoneware, must fail. As Thiemecke testified, "Translucency is a function of thickness." Mrs. Heath testified that whether chinaware would normally be translucent "depends upon how thin it is" and that "Hotel china sometimes is a quarter of an inch thick." The *Dictionary of Tariff Information* 118 (1924) states, with respect to American china:

Its extensive domestic production is essentially as heavy club or hotel tableware, too thick to appear translucent.

In 1 *Summary of Tariff Information* 481 (1929) the following statement appears:

Domestic vitreous china is a comparatively heavy, opaque ware made almost wholly for hotel and restaurant use.

Nor do I agree that appellee has sustained its burden of proving that the merchandise is stoneware. Appellee has pro-

---

2. Use of the word "colored" in classifying articles of stoneware was not original with paragraph 211, having been initially inserted in paragraphs 93 and 94 of the Tariff Act of 1909, ch. 6, Pub.L. No. 5, 36 Stat. 18, from which paragraph 211 was derived. It was inserted to show the intent of Congress that an article of a solid color was "ornamented or decorated." *Notes on Tariff Revision* 105 (1909). Use of the word "colored" in association with the words "painted," "stained," etc., also shows an intent to include the colored body of an article, rather than only the external surface, since if "colored" meant only covering the external

surface (*e.g.* by painting) its use would be superfluous. See *United States v. Wakem & McLaughlin,* 2 Ct.Cust.App. 411, 414–15, T.D. 32170 (1912). Coloring need not necessarily be a super-added process applied after formation of the article. *Cf. United States v. Todd & Co.,* 11 Ct.Cust.App. 50, 57, T.D. 38690 (1921).

3. Thiemecke testified that his company used ball clays and china clays (kaolin) in the manufacture of hotel china. Stowell testified that ball clays, feldspar, and silica are basically the ingredients of fine china.

duced no evidence to show that iron or titanium was present in the clay from which the imported decanters were produced. Indeed, the test report approved by appellee's witness West shows that neither iron nor titanium was present in the sample of the decanters. If appellee considered the expert testimony of Mrs. Heath, that stoneware is manufactured only from fire clay or iron-bearing ball clays and not from white clays, to be erroneous, its burden was to rebut that testimony.

In view of the foregoing, I concur in reversing the judgment of the Customs Court.

BALDWIN, Judge (dissenting).

I disagree with the reasoning and decision of the majority since I believe that the evidence *of record* does not support the position that the ceramic articles in question are not opaque.

The majority opinion points out the clear error of the Customs Court in finding that all of the witnesses conceded that Exhibit 1 is opaque. I am compelled to remand this case, however, for the purpose of determining whether there is substantial evidence *of record* to support the conclusion that the goods in question are in fact opaque. I do not believe that the examination conducted by the majority with their "penlight type of flashlight powered by two 'AA' cells and a Christmas tree bulb of white glass of approximately 7 watts" constitutes evidence *of record*, regardless of whether appellee "challenges" this court to make such an unauthorized test.

Although we stated in *Montgomery Ward & Co. v. United States,* 61 CCPA 101, C.A.D. 1131, 499 F.2d 1283 (1974) that in a classification case, we are not limited to review of questions of law and can consider whether the lower court's findings of fact conform to the weight of the evidence, nowhere, to my recollection, have we taken it upon ourselves to generate our own evidence while completely disregarding the record below. To generate evidence ourselves in the absence of the interested parties, is, in my opinion, a violation of due

process. I am certain that the majority was motivated by an attempt to reach what they consider to be the correct conclusion in this appeal. However, justice cannot be accomplished by disregarding established rules of procedure or the constitutional limitations on the jurisdiction of a reviewing court. See *Babcock v. Berkson,* 121 Cal. App.2d 710, 264 P.2d 155 (1953). Except where otherwise provided by constitutional or statutory provision, an appellate court is without power to make its own independent findings of fact. See *Culinary Institute of America v. Board of Zoning App.,* 143 Conn. 257, 121 A.2d 637 (1956); *Paurley v. Harris,* 77 Idaho 336, 292 P.2d 765 (1956); *Bills v. Boettcher,* 116 Ind.App. 631, 65 N.E.2d 495, *rehearing denied,* 116 Ind.App. 631, 66 N.E.2d 131 (1946); *Himelfarb v. Novadel Agene Corp.,* 305 Mass. 446, 26 N.E.2d 320 (1940).

The rationale underlying such a prohibition becomes clear in this case. There is no testimony as to whether the bases of the vessels of Exhibit 1 are "very thin" within the meaning of the TSUS; and, more importantly, there is no opportunity for appellee to rebut the presumption that the majority has made that the goods are not, in fact, very thin. Similarly, there is no evidence that the light source used to determine translucency would be accepted by an expert as being proper. I cannot discern the basis for the majority conclusion that a 7, rather than a 5 or 50 or any other watt "Christmas tree bulb," is the proper instrument to be used in determining opacity or lack thereof. One may argue, I suppose, that a "penlight" flashlight is reasonably weak so that if one could see through the goods while using such a light source, the goods must be translucent. But again, appellee has had no opportunity to rebut this argument with either cross-examination or an expert witness of its own.

In essence, I am in fundamental agreement with the following statement abstracted from 5 C.J.S. *Appeal & Error* § 1460d (1958) [citations omitted]:

The reviewing court is confined to the facts specifically found by the trial court,

in the absence of a request for a finding based on the evidence relied on. Conversely, the reviewing court cannot accept as true facts, relied on by a party, which the trial court did not find and was not requested to find. The reviewing court may not make findings of fact for or against appellant, and cannot consider evidence to find facts or make a decision upon them or supplement the facts found by the trial court with any additional facts by means of inferences or presumptions from the direct findings reported.

The majority states that appellee failed to carry his burden of proof to show that the importations are "stoneware" by failing to establish the opaqueness of the imports "primarily because the evidence of record shows translucency." I disagree. West was the only witness to give an opinion as to whether the imports were opaque. West "*found the material * * * to be opaque.*" [Emphasis added.] None of the other witnesses stated that the goods were *not* opaque. Clearly *this* evidence of record does not "show translucency."

I also disagree with the reasoning and decision of the concurring opinion, which concludes that the goods are not stoneware solely because they were not proved to have been made with clay containing iron or titanium. This conclusion lacks statutory foundation because the TSUS definition of stoneware does not require it to be made with any particular kind of clay; it states only that stoneware "contains clay as an essential ingredient."

The legislative history on the point indicates that the term "stoneware clay" was originally proposed as part of the definition of stoneware in the TSUS, but was abandoned because no such thing as "stoneware clay" was known to the trade:

Objection was made at the hearing to the provision that stoneware has a body which contains by weight 50 percent or more of "stoneware clay." Doubt was expressed of the general acceptance of the term "stoneware clay," as identifying any specific type of clay, and attention was directed to potential administrative and interpretative problems which could result from the definition. [*Tariff Classification Study*, Schedule 5, p. 79 (1960).]

The "doubt" referred to was expressed at the September 18, 1958, hearings by Mr. J. Bradley Colburn, an attorney representing an association of 13 importers of English earthenware and chinaware, as follows:

We have made diligent inquiry of manufacturers and other sources available to us thus far and we are unable to determine satisfactorily what stoneware clay is. [*Id.* at 228.]

Mr. Colburn followed up his oral testimony with a written memorandum dated October 1, 1958, in which he stated:

Diligent inquiry both here and in England has failed to disclose any manufacturer, importer, or distributor who is familiar with or understands the meaning of "stoneware clay." [*Id.* at 263.]

It is manifest from the express words of the statute as finally adopted and from its legislative history that the TSUS definition of stoneware does not require any particular kind of clay.

The concurring opinion admits that the TSUS does not specify the kind of clay from which stoneware is made, but finds such a requirement in the testimony of two witnesses, Heath and Thiemecke. It is difficult to see how this testimony can be deemed to limit the plain words of the statute, particularly in light of the legislative history just cited. It does not even purport to convey the understanding of the trade at the time the TSUS was enacted. Indeed, the main testimony relied on, that of Edith Heath, to the effect that stoneware is manufactured "only from fire clay or iron bearing ball clays and not from white clays," was not in response to a direct question as to the kinds of clay from which stoneware could be or has been made. The question she was asked, in the course of direct testimony about how her company made its stoneware, was simply, "Is stoneware manufactured from fire clay?" Such a response as she gave cannot be expected to have been given with the witness's full consideration of all possible com-

positions for making stoneware. Mrs. Heath's statement that stoneware is not made from white clays may have been her impression, but that impression does not square with the statutory definition which includes the phrase "not commonly white," which clearly implies the existence of white stoneware. How can white stoneware be made without using white clay?

Mr. Thiemecke was a highly qualified witness in the technology of ceramics, but he did not testify that stoneware must be made from clays containing iron or titanium.