DELCO ELECTRONICS, DIV., GENERAL MOTORS CORP., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 85–10–01462

---

[3]According to the plaintiff, this practice has now been codified at 19 C.F.R. § 162.74(g). *See* 51 Fed. Reg 23047 (June 25, 1986).

(Decided September 25, 1987)

*Grunfeld, Desiderio, Lebowitz & Silverman* (*Steven P. Florsheim, Robert B. Silverman*) for plaintiff.

*Richard K. Willard,* Assistant Attorney General, *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Civil Division, United States Department of Justice (*Saul Davis*) for defendant.

## OPINION

RESTANI, *Judge:* This action concerns the proper classification for tariff purposes of circuit boards assembled in Singapore and imported into the United States during the years 1978 through 1983, which were then incorporated into car radios and tape players. Depending on the type of board, the United States Customs Service (Customs) classified the boards as either car radio receivers or amplifiers. Plaintiff disputes the classifications and asserts that the boards classified as car radio receivers were parts of radio reception apparatus. It further asserts that the amplifiers were not "stand alone" amplifiers and could not be classified under the provision for amplifiers, but must be classified as machines and parts thereof.[1]

## AMPLIFIERS

At the conclusion of plaintiff's case defendant moved for judgment in its favor. The motion was granted as to the boards classified as amplifiers and the reasons for the ruling were fully set forth at that time. The main reasons will be repeated here. The case of *General Electric Co. v. The United States,* 2 CIT 84, 90–91, 525 F. Supp. 1244, 1249 (1981), *aff'd* 69 CCPA 166, 681 F.2d 785 (1982)[2] held that the amplifier portions of other articles (phonographs) were audio amplifiers, classifiable under item 684.70, Tariff Schedules of the United States (TSUS), the classification asserted by Customs here. Such classification seems consistent with the plain language of item 684.70 which merely lists, among other items, "audiofrequency electric amplifiers."

Plaintiff argues that the Brussels Nomenclature (1955),[3] which may be utilized as legislative history of TSUS, if the applicable language of TSUS is similar,[4] indicates that the relevant portion of item 684.70 should be construed to cover stand alone amplifiers only. The court in *General Electric* did not address the Brussels Nomenclature and it is likely that it was not addressed by the parties. This does not appear to be a sufficient reason not to follow the holding of the Court of Appeals.

---

[1] *See* item 678.50, Tariff Schedules of the United States (1978–83).

[2] The court adopted the Court of International Trade opinion.

[3] The complete title is the "Nomenclature for the Classification of Goods in Customs Tariffs."

[4] *See Toyota Motor Sales,* 7 CIT 178, 185, 585 F. Supp 649, 656 (1984), *aff'd* 753 F.2d 1061 (Fed Cir 1985)

For the sake of argument, the court considered plaintiff's legislative history argument.[5] Although the language of the Brussels Nomenclature tends to support plaintiff's view, it is written in exemplary rather than definitional terms. The use of words such as "generally" and "commonly" provides no clear indication that of all the articles commonly called "amplifiers," only stand alone amplifiers are to be classified under the broadly worded TSUS item. Accordingly, the court would not reject the plain language of TSUS on the basis of the inconclusive legislative history cited here. Customs' classification of the circuit boards which contain the audio amplifiers is correct.

### RECEIVERS

A much more troublesome question is the proper classification of the circuit boards that contained many of the components of a receiver. Plaintiff asserts that the boards are merely parts of a receiver and thus must be classified under item 685.29, TSUS, which reads:

> Radiotelegraphic and Radiotelephonic transmission and reception apparatus; radio-broadcasting and television transmission and reception apparatus and parts thereof:
> \* \* \* \* \* \* \*
>
> Other:
> \* \* \* \* \* \* \*
>
> > Other.

Customs' classification, item 685.21, includes the same superior heading and the immediately inferior "other," but specifically covers:

> Solid-state (tubeless) radio receivers:
>
> > Designed exclusively for motor vehicle installation.

The question before the court, therefore, is whether the boards *per se* are substantially complete car radio receivers or whether they are parts of the same. *See* General Headnote 10(h), TSUS; *Daisy-Heddon, Div. Victor Comptometer Corp.* v. *United States,* 66 CCPA 97, 600 F.2d 799 (1979).

---

[5]The relevant language is contained in the Explanatory Notes to the Brussels Nomenclature, Vol III at pp. 950–51 which reads:

Audio-frequency amplifiers are used for the amplification of electrical signals of frequencies falling within the range of the human ear The great majority are based on thermionic valves, but some are based on transistors. The high tension and heater current requirements of the valves are generally supplied by a built-in power pack, which may be fed from the mains or, particularly in the case of portable amplifiers, from electric accumulators, alternatively, the amplifier may be powered entirely by batteries.

The input signals to audio-frequency amplifiers may be derived from a microphone, a gramophone pick-up, a magnetic tape head, a radio feeder unit, a film sound track head or some other source of audio-frequency electric signals. Generally speaking, the output is fed into a loudspeaker, but this is not always the case (pre-amplifiers, for example, feed into a succeeding amplifier).

Audio-frequency amplifiers contain a volume control for varying the gain of the amplifier, and also commonly incorporate controls (bass boost, treble lift, etc.) for varying their frequency response \* \* \*

There is no dispute that plaintiff intended the circuit boards to be assembled with other components into articles which were to be installed in motor vehicles. The testimony at trial also revealed that the imported apparatus contained some parts of a type normally seen in car radios and generally not in radios for other purposes. The boards, in their condition as imported, however, were not designed to be installed in motor vehicles as car radio receivers.

Defendant argues that one first must decide whether the circuit boards are unfinished radio receivers before one addresses the "designed for" qualifying provision, citing General Headnote 10(c)(ii), TSUS. Plaintiff argues that one should consider suitability for motor vehicle installation in deciding whether the circuit boards are substantially complete articles rather than parts. General Headnote 10(c)(ii) states:

> (c) an imported article which is described in two or more provisions of the schedules is classifiable in the provision which most specifically describes it; but, in applying this rule of interpretation, the following considerations shall govern:

> \*        \*        \*        \*        \*        \*        \*

> (ii) comparison are to be made only between provisions of coordinate or equal status, i.e. between the primary or main superior headings of the schedules or between coordinate inferior headings which are subordinate to the same superior heading.

The case at hand does not involve the issue of relative specificity, but deals with mutually exclusive provisions. Thus, Rule 10(c)(ii) would not appear to apply directly. Applying Rule 10(c)(ii) to bar the court from considering the entire tariff provision under which the imports were classified could prevent the court from properly effectuating legislative intent. In deciding whether the subject merchandise is properly dutiable under item 685.21, the court must consider whether it is a substantially complete receiver *for motor vehicle installation,* not whether it is a substantially complete receiver in an abstract sense or for some other unknown purpose. The court has no way of determining if an article is substantially complete without reference to its intended function.

No cases in this court or its predecessor have been discovered that address the question of what constitutes a car radio receiver. Thus, the court must analyze the generally applicable principles that determine whether a device is a substantially complete article or a part of the same.

The factors that come into play in deciding whether an article is substantially complete when it is missing some parts include:

> \* \* \* (1) Comparison of the number of omitted parts with the number of included parts; (2) comparison of the time and effort required to complete the article with the time and effort required to place it in its imported condition; (3) comparison of

the cost of the included parts with that of the omitted parts; (4) the significance of the omitted parts to the overall functioning of the completed article; and, (5) trade customs, i.e., does the trade recognize the importation as an unfinished article or as merely a part of that article.

*Daisy-Heddon* at 102.

For clarity's sake the court will examine the factors out of order starting with the fourth factor. The circuit boards clearly are missing items which are essential to their use as car radios, but *Daisy-Heddon* makes clear that this factor cannot be determinative. Nonetheless, the court must assess the significance of the omitted parts in relation to those components that are present. The basic electronic functions of any radio receiver are detection of radio signals, selectivity and amplification. *See Channel Master, Div. of Avnet, Inc.* v. *United States,* 10 CIT 684, 648 F. Supp. 10 (1986), and *General Electric.* It appears that virtually all of the electronic circuitry necessary to perform the basic functions of detection and amplification are contained on the circuit board. The selectivity circuitry, however, is incomplete.

Selectivity may be subdivided into Radio Frequency (RF) selectivity and Internal Frequency (IF) selectivity. The components for IF selectivity are present on the circuit board. The basic components for RF selectivity are missing from the circuit board. Although some other types of receivers do not require RF selectivity, the testimony at trial was clear that a device lacks the basic capabilities of a car radio if it lacks RF selectivity.

Some witnesses opined that if one of the imported circuit boards were linked to a power source, speakers and an antenna, it would be capable of picking up one frequency on the FM band and one frequency on the AM band because of IF selectivity. A seemingly well-designed experimental use of the circuit board, however, failed to produce any sound resembling voices or music at any frequency. As no broadcast station transmits at the internal frequencies of the circuit board, this is not surprising.[6] There was also testimony that the IF selectivity components are more important because they perform the broader selectivity functions. This view was demonstrated to be related to abstract concepts of what constitutes a radio receiver and is not related to the actual functioning or capabilities of a car radio receiver. The court concludes that for car radios generally, and for the radio to be assembled here, in particular, RF selectivity is a basic electronic function which is very significant in relation to other car radio electronic functions. Thus, the circuitry necessary to this function is also very significant.

---

[6]There was some testimony that there are non-voice transmissions, for aircraft guidance purposes, at one of the internal frequencies. This seems irrelevant to the functioning of a car radio.

Also missing from the complete car radio receiver incorporating the circuit board is the metal chassis (a five-sided box) which has three basic functions. It holds the board and other parts of the receiver, it shields out engine interference and it prevents internal signals from interfering with the functions of other apparatus. There is some authority that a metal chassis is a basic part of a radio receiver. *See Symphonic Electronic Corp.* v. *United States,* 77 Cust. Ct. 147, 149–150, C.R.D. 76–5 (1976). It seems clear that for a car radio, in particular, a metal chassis is necessary to proper functioning.

In addition, all parts which allow tuning from station to station or enhance tuning of a car radio are missing. These range from internal mechanical apparatus to knobs, button covers, a faceplate and marker. Parts which allow tuning from one station to another are not important to some types of radios. *See e.g. NEC America* v. *United States,* 8 CIT 184 (1984), *aff'd,* 760 F.2d 1295 (Fed. Cir. 1985). For such receivers only one channel is necessary. Tunability from channel to channel is, however, a function of car radio receivers, as the testimony demonstrated, and, as indicated previously, all parts for this purpose are missing from the circuit board.[7]

The next factor to be considered is the fifth factor, trade identification. First, there is a problem with what constitutes the trade. The automobile industry, like any ordinary consumer, would not recognize these circuit boards as car radio receivers or substantially complete car radio receivers. It appears that those in the electronics industry most likely would refer to the merchandise as "receiver boards." The court concludes from this that neither industry accepts the merchandise as car radios, unfinished car radios or substantially complete car radios.

Assessment of the second factor involves a preliminary decision as to what is the proper comparison. The parties disagree as to whether one compares the time needed to make the entire imported boards including their component parts with the final assembly time in the United States or whether one may consider the time needed to make the parts added in the United States.[8] *Daisy-Heddon* did not involve addition of complicated componentry, and did not clearly decide this point. As the weighing of the factors is not a matter of precise mathematics, this debate may be purely academic. For the sake of argument, however, the court will apply the *Daisy-Heddon* factors narrowly and compare only final assembly time in the United States with the time needed to make the imported board and its component parts. The imported circuit board is made of various silicone chips and welds and other components on a board.

---

[7]Various other parts of the assembled car radio were not on the circuit boards. Included among the missing electrical parts mentioned in the testimony were an AM antenna trimmer capacitor, a choke, a spark plate and a dial lamp fixture. *See generally,* Exhibits 5 and 14.

[8]Of particular focus was manufacture of the coil board, which involves precise coiling and alignment and various welds. The coil board was manufactured in the United States and joined in the United States with the imported circuit boards and other parts to form the complete radio.

The time to *make* the componentry assembled abroad and to assemble it abroad seems to be greater than the time needed to finally assemble the various parts after importation.[9] Although, as indicated, *Daisy-Heddon* does not address directly the time and effort needed to make the United States added components, it does address the related concept of cost of those components. Thus, the court should at least keep this in mind when deciding how much weight to give the second factor, if narrowly interpreted, in a case involving assembly of complicated components.

As to the first factor, plaintiff used ordinary business records and arrived at a parts count of approximately 160 for the imported circuit boards. Once again, using ordinary business records plaintiff arrived at a parts count of 306 for the United States added components. Defendant takes issue with plaintiff's parts count, but provided none of its own. Plaintiff's parts count is not the only one that could have been done. Purchased parts, no matter how many subparts they contained, were counted as one part. Although this is true for both the imported boards and the domestically added parts, there appear to be more uncounted subparts on the imported board side of the comparison. Nonetheless, as ordinary business records were used, and uniform standards were applied, the court will accept the count, but because of the subparts issue the court must consider the parts comparison as more equal than the numbers reflect.

As to the third factor, plaintiff's cost calculations were challenged on a variety of grounds, but no evidence was produced which convinces the court that plaintiff's cost records are not reliable, or that they include any improper factors. Thus, the court accepts plaintiff's calculation as explained by the testimony of its accounting employee, Max McNeal, that more than one half of the cost of the finished article involved components added in the United States after importation.[10] Overall, the court concludes that significant parts, time, cost and effort were required to make a complete car radio receiver from the imported circuit board.

Although it is difficult to compare products, this case appears qualitatively different from the addition of a few parts to complete a fishing reel (*Daisy-Heddon*), the simple insertion of crystals into an otherwise complete scanner (*Channel Master*) or the addition of some wires, linkages and a cosmetic cabinet to a receiver that lacked no essential electronic parts (*General Electric*).[11] Even if one disregards the external, partially cosmetic elements, such as the button covers, faceplate, marker and knobs, at the very least, the car

---

[9]The testimony presented was not specific enough to make a more precise finding as to this factor. Given the other factors, this imprecision does not create sufficient doubt so that further evidence is required.

[10]Some components were made in the United States and shipped to Singapore for inclusion in the boards, they are included in the values of the imported boards. Presumably plaintiff will get any credit it is entitled to for such components under various provisions of the tariff schedules.

[11]No power source, speakers or outer cabinet are part of the product involved here. It is a very basic item even in its final assembled form

radio receiver would still lack internal tunability features, various RF selectivity components and a metal chassis. With all of these parts missing the circuit board is not a substantially complete car radio receiver.

To put this product in perspective, if one looks at the total costs of the United States labor and components added after importation they constitute approximately 70% of the total cost of the product. Defendant would argue that this is because domestic labor and related costs are higher. Such costs may be higher, but this does not account for the entire difference. The testimony at trial revealed that the parts added at final assembly in the United States are not just screws and simple metal pieces as in *Daisy-Heddon;* they include complicated components which require technical skill to make and to assemble into the final product. However the court looks at the imported boards, they are not substantially complete car radio receivers and may not be classified under item 685.21 as receivers designed for motor vehicle installation.

Accordingly, judgment is granted in favor of plaintiff respecting the boards classified as "receivers."